UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

DARRELL J. PARKS,                    )
                                     )
        Plaintiff,                   )        Civil No. 6:10-355-GFVT
                                     )
V.                                   )
                                     )        **MEMORANDUM OPINION
HOLLY ANDERSON,                      )                &
Case Manager, et al.,                )             ORDER**
                                     )
        Defendants.                  )

**        **        **        **        **

Plaintiff Darrell J. Parks is an inmate formerly confined at the United States Penitentiary

- McCreary ("USP-McCreary") in Pine Knot, Kentucky.[1]  Parks, proceeding *pro* se, filed a civil

rights complaint pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388

(1971), alleging that during the time he was an inmate at USP-McCreary, the named defendants,[2]

jointly and severally, violated his constitutional rights under the First, Fifth, Eighth, and

Fourteenth Amendments to the U.S. Constitution.  Parks seeks a declaratory judgment to that

---

[1]  Parks was an inmate at USP-McCreary from October 23, 2008, to February 3, 2010.  He was transferred to the United States Penitentiary in Lewisburg, Pennsylvania after he filed his complaint in this action.

[2]  The named defendants, all prison staff/personnel at USP-McCreary, are (1) Holly Anderson, Case Manager; (2) T. Jones, Senior Correctional Officer; (3) K. Straub, Correctional Counselor/Acting Lieutenant; (4) John Doe, Unknown Lieutenant; (5) Mr. Moulton, Unit Manager; (6) Fernando J. Messer, Executive Assistant; (7) Mr. W. Wood, Correctional Counselor; (8) Ms. Woods, Case Manager; (9) Ms. K. Bryant, Senior Correctional Officer; (10) Mr. West, Practitioner's Assistant; (11) T. Gardner, Senior Correctional Officer; (12) Dr. Williard, Psychologist; (13) Mr. Harden, Activities Lieutenant; and (14) Mr. Raitt, Disciplinary Hearing Officer.  Initially, Parks sued the defendants only in their "official capacities," but he later amended his complaint to sue them in their "individual capacities."  [R. 30]

effect, as well as compensatory damages against the defendants, in their individual capacities, totaling $7 million, punitive damages totaling $14 million, trial by jury, the appointment of counsel, and his costs and associated fees.

The defendants have moved to dismiss this action, pursuant to Fed. R. Civ. P. 12(b))(6), for several different reasons, or alternatively, for summary judgment. [R. 53] Parks having filed a response to the defendants' dispositive motion[1] [R. 70], this matter is ripe for review.

# I

Parks' complaint centers on his encounters and interactions with various USP-McCreary personnel during 2009. Parks complains about separate incidents that allegedly occurred in May, June, August, and October of 2009. More particularly, Parks complains about events that occurred on May 22, May 23, June 4, June 5, June 6, June 9, June 14, June 24, July 16, August 9, August 18, August 19, August 20, August 24, October 15, and October 22, 2009. Generally, Parks alleges that his constitutional rights were violated by the defendants' "retaliation and/or conspiracy to retaliate and/or campaign of harassment" against him. [Complaint - R. 2, p. 2].

A brief chronology of the events about which Parks complains follows:

a.    **May 22, 2009**

Parks states that on May 22, 2009, he approached Case Manager Anderson and asked her to contact the United States Parole Commission to inquire about his parole and that she informed him that she did not have time to do that. [Complaint, R. 2, pp. 5-6]. In response,

_____

[1] Parks' response is captioned as follows: "Plaintiff's Opposition Motion To Defendants' Motion To Dismiss And/or Summary Judgment, and Counterclaim for Summary Judgment." [R. 70] The Court construes Parks' "counterclaim" for summary judgment as a cross-motion for summary judgment.

Parks states that he threatened to file a grievance against Case Manager Anderson and that in response to his threat, she retaliated against him by ordering that the Sanitation Closet be locked to keep him from using it as he had been for a law library/study room.  [*Id.,* Page #6, ¶¶ 19-20]

Parks also alleges that Case Manager Anderson discussed confidential information regarding him in an Incident Report with another inmate and that she indicated that she was going to transfer him to a distant institution if a transfer were recommended by the Disciplinary Hearing Officer (hereinafter "DHO").  [*Id.*, Page ID #7, ¶ 23].

**b.     May 23, 2009**

Parks states that on May 23, 2009, as he was en route to breakfast, he approached Officer Jones and inquired whether Officer Jones had called him for the two-hour check and that Officer Jones responded that Parks was 24 minutes late and that he would be written up.  **[***Id.,*** Page ID #7, ¶ 24].  Parks became upset by Officer Jones's response to his question, leading to a confrontation between them.  Ultimately, Parks states that he was escorted to the Lieutenant's Office where he was moved to a different unit due to his problems with Case Manager Anderson and Officer Jones.[3]  [*Id.*, Page ID #9, ¶ 45].

**c.     June 4, 2009**

Parks claims that on June 4, 2009, he asked Counselor Straub to file/process some grievances on his behalf and requested that Counselor Straub fill out the indigence section of a motion he was going to file.  Parks states that Counselor Straub allegedly responded by stating "I'm not doing nothing today."  [*Id.*, Page ID #10, ¶¶ 50-53].  Parks indicates that he then

---

[3] Parks assumes that Officer Jones told the Lieutenant that Parks had a problem with Case Manager Anderson because she had posted in the Unit 4-B officer's station that Parks had done something inappropriate in the Sanitation Closet.  Parks implies that this was part and parcel of the defendants' conspiracy to retaliate against and harass him.  [*Id.*, Page ID #9, ¶ 48].

taunted Counselor Straub by telling him that he now needed another grievance form to file a grievance against him and that Counselor Straub allegedly reacted by yelling at him, "I don't care... you can't do nothing to me! File all you want." [*Id.*, Page ID #10, ¶ 54].

**d.      June 5, 2009**

On this date, Parks states that he was standing in the Unit Team's hallway area during open house to see Counselor Straub when Case Manager Anderson demanded that he leave the Unit Team area. [*Id.*, Page ID #10, ¶¶ 55-56]. Parks assumes that Case Manager Anderson made this demand "in an attempt to prevent [him] from filing his grievances." [*Id.*, Page ID #10-11, ¶¶ 56-57]. Parks states that he did not comply with Case Manager Anderson's request and remained outside the Unit Team's door, waiting to see Counselor Straub who was "disrespectful, unprofessional, vindictive" and "sought to discourage the [Plaintiff]" from filing his grievances. *Id.* Essentially, Parks admits that he got into a shouting match with Counselor Straub and that he did not move away from the Unit Team's door, even after being ordered to do so, causing Counselor Straub to call for the Lieutenant's Office for assistance and having him moved to the SHU. Parks alleges that he was placed in the SHU under the "false pretense of Insolence Towards Staff and Inciting a Riot." [[*Id.*, Page ID #11, ¶ 61].

Parks states that he was escorted to the Lieutenant's Office and then to the SHU pending an Incident Report and that shortly thereafter, "false" charges were filed against him for violations of Code 299, "Conduct disruptive to security or orderly running of a BOP facility, most like" and Code 212, "Engaging in or encouraging a group demonstration." [*Id.*, Page ID #12, ¶¶ 69-71]. Parks claims that the charges were "concocted" due to his statements and his desire to file grievances and complaints against BOP staff. *Id.*

4

**e.    June 6, 2009**

Parks claims that the Lieutenant investigating the June 5, 2009, Incident Report assisted Counselor Straub in "his retaliation/conspiracy to retaliate/campaign for harassment" by denying him due process and failing to interview his witnesses and to review the video of the incident.  [*Id.*, Page ID #12-13, ¶¶ 72-76].

**f.    June 9, 2009**

Parks states that on June 9, 2009, Case Manager Anderson was a member of the Unit Disciplinary Committee (hereinafter "UDC") hearing.  Parks believes that since Case Manager Anderson was on his UDC, she was "carrying out [Counselor Straub's] retaliatory act by processing the incident report as true to the DHO; notwithstanding, that she was a part of the incident and having an active role and being on the scene."  [*Id.*, Page ID #13, ¶¶ 77-78].

**g.    June 14, 2009**

Parks claims that on June 14, 2009, he stopped an "unknown Lieutenant" in Unit 6-B and asked him if he would be his staff representative.  [*Id.*, Page ID #13, ¶ 79].  According to Parks, the Lieutenant agreed to be his staff representative and that approximately one week later, the Lieutenant supposedly told the Plaintiff that he should call him and the Special Investigations Service (hereinafter "SIS") Lieutenant because they had viewed the video tape and that it did not show that Parks was hostile, nor "getting a lot of prisoners for your cause."  [*Id.*, Page ID #13, ¶¶ 79-80]  Parks also claims that the unknown Lieutenant was aware that he was not getting along with his Unit Team "because of filing complaints/grievances against them... ." [*Id.*, Page ID #13-14, ¶ 80].

**h.    June 24, 2009**

Parks states that he was transferred to the SHU after two and a half weeks in Unit 6-B and that for approximately the same time period he asked DHO Raitt for a DHO hearing but that the DHO did not have the necessary paperwork. [*Id.*, Page ID #14, ¶¶ 81-82] Parks assumes that it was Case Manager Anderson who purposely withheld and failed to process the Incident Report in order to "deny [the Plaintiff] of due process" so as to harass, retaliate, and conspire to retaliate against him. [*Id.*, Page ID #14, ¶ 85]

Parks also claims that in the meantime Unit Manager Moulton used intimidation and harassment against him by telling him that he was being recommended for the Special Management Unit (hereinafter "SMU"). [*Id.*, Page ID #14, ¶ 83] Parks states that he asked, "Am I being recommended to the SMU because I want to file?" *Id.*, 84, and that the response was simply that he was being recommended to the SMU. *Id.*

**i.    July 16, 2009**

Parks states that on or about July 16, 2009, the Incident Report was expunged by DHO Raitt, and he was released from the SHU on June 25, 2009. [*Id.*, Page ID #14, ¶¶ 86-87]. Parks claims that upon his release from the SHU, his legal and personal mail was purposely misdirected in an attempt to "thwart maybe even botch his legal filings." [*Id.*, Page ID #14, ¶ 87].

**j.    AUGUST 9, 2009**

Plaintiff states that on or about August 9, 2009 he was involved in a UDC hearing with Counselor Wood and Case Manager Anderson in which he was afforded no privacy, was denied an opportunity to make a statement, and that staff did not log all his witnesses. [*Id.*, Page ID #18, ¶ 119]. Parks assumes that Counselor Wood and Case Manager Anderson sat as board

members at the UDC hearing in order to retaliate and to conspire to retaliate, in their campaign of harassment in an attempt to deny him due process during his UDC hearing. [*Id.*, Page ID #18, ¶¶ 120-121].

**k.    August 18, 2009**

Parks claims that on August 18, 2009, he approached Officer Bryant and requested to be placed on suicide watch. [*Id.*, Page ID #14, ¶ 88]. In response, Parks states that Officer Bryant conveyed his request to be placed on suicide watch to the Operations Lieutenant and allegedly threatened Parks that if he continued to file complaints on her friends and co-workers, especially Case Manager Anderson, he was going to end up in the SMU. [*Id.*, Page ID #14-15, ¶¶ 88-89]. Parks alleges that Officer Bryant got into an argument with him while he waited to be escorted to the Lieutenant's Office. [*Id.*, Page ID #14, ¶¶ 88-92].

Parks' encounter with Officer Bryant resulted in Officer Bryant charging Parks in another Incident Report, and Parks was taken to the SHU pending disposition. [*Id.*, Page ID #15, ¶ 97]. Parks asserts that Officer Bryant's report was a false Incident Report "with malicious and/or wanton sadistic intention[s]" and for "retaliation/conspiracy to retaliate and/or campaign of harassment." [*Id.*, Page ID #15, ¶ 98].

Parks alleges that Counselor Straub remarked that he understood why Parks wanted to commit suicide, *viz.*, because he had been caught doing something that Parks did not disclose in the Complaint. [*Id.*, Page ID #16, ¶ 99]. Parks states that he responded that he did not do anything and that staff was just retaliating against him. [*Id.*, Page ID #16, ¶ 100]. Parks further complains that he asked Counselor Straub to interview the Lieutenants in relation to his request to be placed on suicide watch, and he alleges that Counselor Straub purposely conducted a bad

investigation in order to deny him due process in furtherance of "their retaliation/conspiracy to retaliate [and] campaign for harassment...." [*Id.*, Page ID #16, ¶¶ 101-103].

Additionally, Parks alleges that when prison psychologist Dr. Willard examined him due to his alleged suicidal ideations that he asked her to be his staff representative in the pending Incident Report and that she agreed to do so. [Complaint, Docket # 2, Page ID#17, 108-09].

Also, Parks claims that Officer Gardner lied and submitted false statements in order to mislead and deny Parks due process and to retaliate and to further the conspiracy to retaliate and/or the campaign for harassment because he was not at Unit 4-B on August 18, 2009. Parks surmises that Officer Gardner was seeking reprisal because Parks had filed an unnecessary use of force claim against him on or about August 9, 2009. [*Id.*, Page ID #18, ¶¶ 116-118].

**l.      August 19, 2009**

Parks states that on August 19, 2009, he had a UDC hearing for the second Incident Report issued against him on August 18 by Case Manager Anderson and Counselor Wood and that this Incident Report was forwarded to the DHO. [*Id.*, Page ID #16, ¶ 104]. Parks elaborates that while PA West was making his rounds in the SHU, Parks told him about a "sensitive medical problem" which PA West examined and evaluated. [*Id.*, Page ID #16, ¶ 105]. Parks complains that he was accused of doing an act that he "cannot perform" (presumably due to his "sensitive medical problem") and that PA West incorrectly entered findings in Parks' medical record that Parks did not have the alleged medical problem. [*Id.*, Page ID #16, ¶ 106]. Parks now alleges that PA West joined the "conspiracy to retaliate, harass, and/or deny due process" by making misleading statements to the DHO regarding Parks' "sensitive medical problem" that PA West had previously examined and evaluated.

**m.     August 20, 2009**

Parks states that on or about August 20, 2009, he sent Dr. Willard some Inmate Requests for Staff forms, requesting that she ask some specific questions to staff members as part of her duties as his staff representative at the DHO hearing.  [*Id.*, Page ID #17, ¶ 110].  Parks complaints that Dr. Willard mailed these questions to the staff members instead of hand-delivering them and that a month later, Dr. Willard had not obtained the responses to his inquiries.  [*Id.*, Page ID #17, ¶ 111].  Parks also claims that Dr. Willard indicated that the staff could not remember what had happened a month after the incident.  [*Id.*, Page ID #17, ¶ 112].

**n.     August 24, 2009**

Parks alleges that AW Messer "purposely impeded, prevented, botched or thwarted the [Plaintiff s administrative remedy, remedy # 552988" by telling Parks that he was only allowed to file one BP8 complaint form at a time.  [*Id.*, Page ID #11, ¶ 63].  Parks asserts that AW Messer told him to "choose as a matter of importance which complaint to file first, then wait until the disposition of that complaint before another would be issued."  [*Id.*, Page ID #11, ¶ 64].  Reading between the lines of Parks' complaint, Parks implies that AW Messer was participating in a cover up so that Counselor Straub could be promoted to a Lieutenant because he was aware of the grievances Parks had filed against Case Manager Anderson, Officer Jones, and Counselor Straub.  [*Id.*, Page ID #12, ¶¶ 67-68].

**o.     October 15, 2009**

Parks states that on or about October 15, 2009, he asked Dr. Willard about the statement that Lt. Hardin had made and that Dr. Willard simply responded, "I'll tell you during the DHO hearing."  [*Id.*, Page ID #17, ¶ 113].

**p.** **October 22, 2009**

Parks states that at the DHO hearing, Dr. Willard disclosed Lt. Hardin's statement, which was that Parks "only wanted to commit suicide because he was caught [committing the act that the Plaintiff wants to discuss *in camera*] on staff." Parks alleges that the manner in which Dr. Willard handled Lt. Hardin's statement was an attempt by Psychology Services to establish that Parks "only felt suicidal for secondary gain, and not deal with [the Plaintiffs] mental health concerns, after he filed on their inadequate and unprofessional practices." [*Id.*, Page ID #18, ¶ 115]. Parks claims that Dr. Willard intentionally and maliciously attempted to "botch" the Disciplinary Hearing because of "his filing of complaints against Psychology Service[s] and/or retaliation/conspiracy to retaliate/campaign for harassment." [*Id.*, Page ID #17, ¶ 114].

Parks states that during his DHO hearing, he presented as his defense the alleged retaliation by Unit Team staff "because of his desire to seek redress...." [*Id.*, Page ID #19, ¶ 122]. Parks also argued in his defense that Officer Bryant was "employed by 'them' [and] as a favor, communicated the conversation that they had on August 18, 2009, ..." during the DHO October 22, 2009, hearing. *Id.* In his defense, Parks also (1) raised his medical problem which, according to him, would make the action alleged in the Incident Report unlikely and painful, (2) complained of the investigation conducted by the investigating Lieutenant, and (3) questioned the statements by Officer Bryant and PA West.[4]

## II.

**A.** **Incident Reports**

---

[4] Parks' claims arising from events allegedly occurring on August 9, 18, 19, 20 and October 15 & 22, 2009 appear to be related to the same August 18, 2009, incident and Incident Report 1906500. [*Id.*, Page ID #19, ¶¶ 124-126]. Parks' Incident Reports are addressed below.

In his complaint, Parks refers to incident reports that he would like to discuss *in camera*. [*Id.*, ¶¶ 22, 98, 99, 123]. However, Parks does not identify those Incident Reports that he would like to discuss with the court *in camera*. The Bureau of Prisons' ("BOP") records containing Park's Disciplinary Data reflect that eight Incident Reports were filed against Parks during the time he was at USP-McCreary. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7, R. 54-1, p. 2]. Of those eight, four occurred between May 2009 and October 2009. For the sake of clarity, all eight Incidents Reports are addressed below.

## 1.    INCIDENT REPORT: 1792926 — October 26, 2008

On October 26, 2008, while housed in Unit 6-B, cell 104, Correctional Officer Racheal Jamison saw Parks standing on his chair facing the door of his cell masturbating while staring at her. After Parks realized that Officer Jamison had seen him, he immediately turned his light off. Parks' cell was located directly in front of the Officer Station in Unit 6-B. Officer Jamison reported the incident, and Incident Report No. 1792926 was issued to Parks, charging him with a violation of Code 205, Engaging in a Sexual Act.

Parks received a copy of the Incident Report the next day, October 27, 2008. An investigation into the incident was conducted by Lt. Hardin on October 29, 2008.[5] The investigation revealed that Parks had eight prior incident reports for masturbating in front of female staff members. Parks was advised of his rights and replied that he had not committed the charged conduct. Parks was allowed to remain in the general population pending the UDC/DHO hearing. On October 30, 2008, Parks met with the Uniform Disciplinary Committee ("UDC"),

---

[5] The investigation was commenced on October 26, 2008, the day it was reported, but Parks swallowed several pills and was placed on suicide watch. The report of the incident was suspended pending Parks' release from suicide watch. Parks was released on October 28, 2008. [Exhibit 1, <u>Declaration of Carlos J. Martinez</u>, ¶ 7a, Attachment D, DHO No. 17929261, 54-1, pp. 2-3].

and he denied the charges. The UDC referred the Incident Report to the Disciplinary Hearing Officer ("DHO"), and on October 30, 2008, Parks was provided with a Notice of the DHO hearing.

The DHO Hearing was held on December 2, 2008. Parks denied the charges and requested a staff representative. Dr. Reinwalt appeared as a staff representative for Parks. After Parks was advised of his rights, he stated that he was not the one masturbating and that it was his cellmate. Parks' cellmate was called as a witness and stated that he saw Parks pacing, but did not see him do anything wrong. The DHO found that the cellmate's testimony contradicted Parks' version of events, damaging his credibility. Based on the greater weight of the evidence, the DHO found that Parks had engaged in a sexual act, in violation of Code 205. Parks was sanctioned to 45 days of disciplinary segregation, suspended pending 180 days of clear conduct, 120 days loss of commissary, and the forfeiture of 27 days of Statutory Good Time (hereinafter "SGT"). Parks was advised of his appellate rights and was provided with a copy of the DHO decision on December 2, 2008. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7a, Attachment D, DHO No. 17929261, 54-1, pp. 3-4].

## 2. INCIDENT REPORT: 182216 — January 15, 2009

On January 15, 2009, Teacher A. Partin observed Parks masturbating while standing just inside the door of the inmate restroom at the Education Department. On the same date, Parks was charged in an Incident Report with a violation of code 205, Engaging in a Sex Act. He was advised of his rights, and an investigation was conducted on January 22, 2009. During the investigation, Parks made no statements other than challenging the time line of when he received a copy of the Incident Report. Parks did not request a witness. The investigation of this Incident

Report was temporarily suspended pending a request for a psychological evaluation.[6]  Moreover, the investigation revealed that Parks had an extensive history of engaging in sexual acts.  The Incident Report was sent to the UDC for further disposition.

On January 29, 2009, a UDC hearing was held, and the Incident Report was referred to the DHO for further hearing.  Plaintiff was advised of his rights at the UDC Hearing and was provided with notice of the Disciplinary Hearing before the DHO.  Parks requested a staff representative and wished to call a psychology staff member as a witness in relation to his competency.

On February 3, 2009, the DHO hearing was conducted.  During the hearing, Parks waived the right to a staff representative and to present witnesses.  Parks argued that he did not receive a copy of the Incident Report in a timely manner, that the UDC hearing was conducted late, and that a female staff member should not have been looking in the door of a restroom and that anything that he did in the bathroom was a private matter.  Chief Psychologist Rush testified at the hearing that the Plaintiff was responsible and competent for the incident.  The DHO found that the greater weight of the evidence supported a finding that Parks had violated code 205, engaging in a sexual act.  Parks was sanctioned to 60 days disciplinary segregation, 27 days forfeiture of SGT, one year loss of commissary, and one year loss of phone privileges.  Additionally, the previously suspended Disciplinary segregation was executed as a result of this hearing.  Parks was provided with a copy of the DHO hearing decision on February 3, 2009.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7b, Attachment E DHO No. 18222161 - 54-1, p. 5].

---

[6] On January 22, 2009, Parks was found to be responsible for his conduct and competent by Psychology Services.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7b, Attachment E DHO No. 18222161 - 54-1, p. 5].

### 3. INCIDENT REPORT: 1892145 — July 13, 2009

On July 13, 2009, Parks, who was part of the two-hour watch program, failed to check in with a staff member for his 12:00 p.m. accountability check. Control announced for him to report to the nearest staff member at 12:10 p.m., which he failed to do. Compound officers were notified that he was unaccounted for, and he was found at 12:20 p.m. in the blue compound. On July 13, Parks was charged in an Incident Report with a violation of Code 306, Refusing Programs. A copy of this Incident Report was provided to Parks on the same date. On July 13, 2009, an investigation of the incident was conducted, and Parks was advised of his rights. Parks admitted that he did not check in and complained of being in the two-hour watch program.[7]

On July 16, 2009, a UDC hearing was held. Parks alleged that the yellow two-hour watch card was endangering his life, and the UDC found that he had committed the prohibited act and advised him of his right to appeal. The UDC sanctioned Parks to a 30-day loss of commissary and telephone privileges. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7d, Attachment F Incident Report No. DHO No. 1892145 - 54-1, p. 6].

### 4. INCIDENT REPORT: 1892388 — July 14, 2009

On July 14, 2009, Parks was lying on the floor in front of the holding cell in the SHU. Officer Sizemore asked him to stand up, remove his hands from his pockets and provide him with his name and registration number. Parks refused by not responding. Parks was then given a direct order to stand up, remove his hands out of his pockets and provide his name and registration number. Parks again refused by not responding, resulting in his being charged in an

---

[7] On the same date, Parks refused to accept a new two-hour watch card. [Exhibit 1, Declaration of Carlos J. Martinez, ., ¶7c, Attachment F, Incident Report No. 1892145 - R. 54-1, p.6].

Incident Report with a violation of code 307, Refusing to Obey an Order. On July 14, Parks was advised of his rights and an investigation was conducted. During the investigation, Parks claimed that he was not given an order. The Incident Report was referred to the UDC.

On July 16, 2009, the UDC conducted a hearing. At that hearing, Parks claimed to have never refused an order. The UDC found that Parks had committed the prohibited conduct, advised him of his right to appeal, and sanctioned him to a 60-day loss of telephone privileges and commissary. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7d, Attachment G, Incident Report No. 1892388 - 54-1, p. 6].

5.      **INCIDENT REPORT: 1903299 — August 9, 2009**

On August 9, 2009, Clinical Nurse V. Barnett, attempted to give Parks his medication. As Parks approached the pill line window, Nurse Barnett asked him if he was going to take his pills "today," and Parks responded by being insolent and telling Nurse Barnett to "shut up and give me my medicine." Other prison staff who witnessed Parks' actions submitted memoranda evidencing that he had yelled at Nurse Barnett to "Shut the f. .k up and give me my f.....g meds!" Senior Officer Gardner approached Parks and told him several times to leave the pill line. Parks refused. He was then told to place his hands on the wall. Parks refused, and he was placed on the wall where he continued to be disruptive, telling Officer Gardner to "get your f.....g hands off me!" Parks was pat searched while he continued to yell at Officer Gardner and threatened to file a grievance on Officer Gardner for his actions. Parks was placed in restraints and was escorted to the Lieutenant's Office. Subsequently, Parks was taken to the Health Services area in order to conduct an injury assessment. Parks did not state what the cause of his alleged injury was, but he

complained of shoulder pain.  The medical assessment found no visible injury and a good range of movement.

On August 9, 2009, Parks was charged in an Incident Report with a violation of Code 312, Insolence.  On August 10, 2009, a copy of the Incident Report was delivered to Parks, and he was notified of his rights, and an investigation of the incident was conducted.  Parks denied being insolent to the nurse, claiming that he only asked her to give him his medication.  The investigation found that Parks was properly charged and referred the Incident Report to the UDC. Parks remained in the general population pending the results of the UDC/DHO hearings.

On August 12, 2009, an UDC hearing was conducted.  Parks denied that he yelled at Nurse Barnett.  The UDC found that Parks committed the prohibited act, advised him of his right to appeal, and sanctioned him with a loss of 90 days of telephone privileges.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7e, Attachment H, Incident Report No. 1903299 - 54-1, pp. 7-8].

6.      **INCIDENT REPORT: 1906500 — August 18, 2009**

On August 18, 2009, Officer Bryant observed Parks in Unit 4B standing inside his cell masturbating while looking at her.  Officer Bryant notified the Operations Lieutenant, and an Incident Report was issued, charging Parks with a violation of Code 205, Engaging in a Sexual Act.  An investigation was conducted that day, and Parks was advised of his rights.  Parks claimed that he was innocent of the charged conduct.  The investigation revealed that Parks was appropriately charged, and the Incident Report was referred to the UDC/DHO.  Parks was allowed to remain in the general population pending the results of the UDC/DHO hearing.  The UDC hearing was held on August 19, 2009.  At the hearing, Parks alleged that he had a

statement to make, but he was not allowed to do so, at that time. The UDC referred the charges to the DHO for further hearing. On the same date, Parks refused to sign an Inmate Rights at Discipline Hearing form, and he requested that Dr. Willard act as his staff representative and that PA West and inmate Thompson be called as his witnesses at the DHO hearing.

The DHO hearing was held on October 22, 2009. Parks was advised of his rights, and his witnesses were called. In his defense, Parks accused the UDC of not permitting him make a statement to the UDC that the Operations Lieutenant was not identified in the Incident Report, and Parks questioned why he was not taken to the Lieutenant's Office until he threatened to hurt himself. Parks called Lt. Alexander, Lt. Hardin, Officer Gardner, and inmate Thompson as witnesses. The DHO considered a statement by PA West that Parks did not have any medical condition that would have prevented him from committing the prohibited act of masturbation. Lt. Alexander testified that he remembered the incident, and Lt. Hardin testified that he believed that Parks made the statement that he was going to hurt himself in order to draw attention away from the charged offense. Officer Gardner remembered that Parks had received an incident report for engaging in a sexual act and that he later spoke to psychology. Inmate Thompson testified that Parks was not masturbating or engaging in any sexual act in front of staff.

After hearing all of the evidence, the DHO found that Parks had committed the prohibited act of engaging in a sexual act, in violation of Code 205. After addressing all of Parks' arguments and defenses and finding that they had no merit, the DHO found that the greater weight of the evidence supported the charge. The DHO sanctioned Parks to 30 days disciplinary segregation, 27 day loss of SGT, 180 day loss of commissary, 180 days of loss of telephone privileges, and recommended a disciplinary transfer. Parks was advised of his appellate rights

and a copy of the DHO hearing was delivered to him.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7f, Attachment I, DHO No. 1906500 - 54-1, pp. 8-9].

7.    **INCIDENT REPORT: 1968982 — January 20, 2010**

On January 20, 2010, Registered Nurse Bennett-Baker was making her medical rounds in the SHU.  As she passed Parks' cell, Nurse Bennett-Baker glanced towards cell #109 and saw Parks' genitals plastered against the window glass.  Parks was masturbating and moaning. In between his moaning sounds, Parks repeated, "Hey, Miss ... I need a nurse."  Nurse  Bennett-Baker continued making her medical rounds and notified the SHU Lieutenant.  On the same day, Parks was charged in an Incident Report with a Code 205 violation, committing a sexual act. Parks received a copy of the Incident Report, and an investigation was commenced.  Parks was advised of his rights.  Parks admitted to have been masturbating, but argued that he was on his bunk, not in front of the PA.[8]  The investigating Lieutenant recommended that the Incident Report be forwarded to the UDC and the DHO for final disposition.

On January 21, 2010, the UDC hearing was held.  Parks alleged that he was on his  bunk and that another inmate was yelling for the nurse.  The UDC referred the charge to the DHO for further hearing.  On this date, Parks was provided with a Notice of Discipline Hearing before the DHO.  Parks requested inmates Arrington and Perez as his witnesses, and he waived his right to a staff representative.

On January 26, 2010, the DHO hearing was held.  Parks called no witnesses at the DHO hearing.  Parks admitted that he did commit the act of masturbation, but denied that he had called for the nurse or that he was plastered against the door.  Parks stated that he did not intend to

---

[8] PA is shorthand for Physician Assistant.  Parks appears to be referring to Registered Nurse Bennett-Baker.

18

disrespect the nurse.  The DHO found that the act was committed as charged and that the greater weight of the evidence supported a finding that Parks committed the act of engaging in a sex act, in violation of Code 205.  Parks was sanctioned to 27 days loss of SGT, 30 days of disciplinary segregation, 120 day loss of commissary, and 120 day loss of telephone privileges.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7g, Attachment J DHO No. 1968982 - 54-1, pp. 9-10].

**8.      INCIDENT REPORT: 1972603 — January 28, 2010**

On January 28, 2010, Registered Nurse Barnett stopped by the Plaintiffs cell to give him his medications.  Nurse Barnett asked Parks if he needed her to mix the medication with water, to which he replied "yeah".  After she mixed the medication with water and handed it to him, Parks stated that he took his medications with milk.  She responded that his dose was already mixed with water and that he could take it as is or that it would be retrieved.  Parks did not respond and just stood staring at her.  Nurse Barnett retrieved the medication and started to walk away when the Plaintiff started to yell at her very loudly, "you Bitch you need to go back and get trained you sorry ass skinny bitch."  Parks repeated the statement several times and stated, "I'm gonna have you[r] job and you[r] license if I can, I'm gonna report you to the KY Board of Nursing you Bitch."  Parks continued to yell at nurse Barnett while she remained in the range.

Parks was charged in an Incident Report with a Code 312 violation, Being Insolent to Staff.  On January 29, 2010, the Plaintiff was notified of his rights and stated that "[he] did not give a s. .t about [the] report."  Parks requested no witnesses.  The investigator referred the Incident Report to the UDC.  On February 1, 2010, the UDC hearing was held.  At this hearing, Parks admitted he was guilty of the charged offense.  Parks was sanctioned to a 30-day loss of commissary and a 30-day loss of telephone privileges, and on the same date, Parks

was advised of his right to appeal. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 7h, Attachment K, Incident Report No. 1972603 - R. 54-1, p. 11].

## B.    ADMINISTRATIVE REMEDIES

During his confinement in the BOP, Parks has filed 367 Administrative Remedies.[9] [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8 - 54-1, p. 11]. While housed at USP-McCreary, Parks filed 73 Administrative Remedies. *Id.* From May 2009 to May 2010,[10] Parks filed the following potentially pertinent Administrative Remedies: 1) Remedy No. 547040-Fi-Ri-Ai, claiming unprofessional/inappropriate conduct by staff; 2) Remedy No. 548817-Fl-Ri -R2-Ai-A2, claiming unprofessional/inappropriate conduct by staff; 3) Remedy No. 552988-F1-R1-R2-A1, filing staff complaints regarding legal and personal mail; 4) Remedy No. 552990-F1-R1-Al, Appealing UDC hearing for Incident Report No. 1892145; 5) Remedy No. 553007-Fi-Ri-Ai, Appealing UDC hearing for Incident Report No. 1892388; 6) Remedy No. 556951-F1-R1-A1, Appealing Response by Mr. Moulton to BP-8 ½; 7) Remedy No. 547040-Fi-Ri, Appealing Response to BP-8 ½; 8) Remedy No. 559065-F1-R1-A1, Appealing UDC hearing for Incident Report No. 1903299; 9) Remedy No. 559066-F1-R1-A1, claiming unprofessional /inappropriate conduct by staff; 10) Remedy No. 560801-F1-R1-A1, claiming unprofessional/inappropriate conduct by staff; 1 1) Remedy No. 560876-F1-R1-A1 -A2, claiming unprofessional/inappropriate conduct by staff; 12) Remedy No. 564134-F1, claiming unprofessional/inappropriate conduct by staff; 13) Remedy No. 564277-F1-R1-Al -A2, claiming

[9] This was the number of Administrative Remedies filed as of January 13, 2014.

[10] Relevant time table for Administrative Remedies filed in relation to the Plaintiff's underlying allegations. As noted, the Plaintiff filed numerous administrative remedies. It appears that the list 16 Administrative Remedies described in detail below correspond to the claims Parks asserts in the Complaint, which does not identify his Administrative Remedies by number.

unprofessional/inappropriate conduct by staff; 14) Remedy No. 568290-R1-A1, Appeal of DHO Hearing regarding Incident Report No. 1906500; 15) Remedy No. 572247-Fl-R1, claim regarding the Administrative Remedy Procedures; and; 16)Remedy No. 589165-F1, Staff Misconduct.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1, p. 12].

Of the foregoing sixteen incidents described above, Parks appears to have exhausted his administrative remedies only as to two of those incidents (the May 22, 2009, and May 23, 2009 incidents).  However, out of an abundance of caution and to obtain a full view of the events about which Parks complains, the Court has reviewed all of Parks' sixteen administrative remedies, exhausted and unexhausted, as summarized below:

1.     **UNEXHAUSTED ADMINISTRATIVE REMEDIES**

a.      **Administrative Remedy 552988-F1-R1-R2-A1**

On August 12, 2009, Parks filed a Request for Administrative Remedy (hereinafter "BP-9") concerning the filing of complaints against staff and legal/personal mail complaints. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Ai, Attachment L at 83 - R. 54-1, p. 13].

On August 24, 2009, the BP-9 was rejected as untimely.  Additionally, Parks was advised that he was appealing more than one Incident Report on a single appeal form and that he must file a separate appeal for each Incident Report.  *Id.*  On October 13, 2009, Parks filed a Regional Administrative Remedy Appeal (hereinafter "BP-10"), appealing the response to his BP-9.  *Id.* at 93.  On October 14, 2009, the Regional Office rejected the BP-10 because Parks failed to include a copy of an Institution Administrative Remedy Request (BP-9) with his appeal. *Id.*  On November 12, 2009, Parks filed a second BP-10, appealing the response to his BP-9.  On

November 16, 2009, the Regional Office once again rejected the second BP-10 because Parks failed to provide a copy of an Institution Administrative Remedy Request (BP-9). *Id*. at 99.

On December 15, 2009, Parks filed a Central Office Administrative Remedy Appeal (hereinafter "BP-11"), appealing the response to the BP-10. On January 19, 2010, the BP-11 was rejected as untimely. Thus, this claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Ai, Attachment L at 101 - R. 54-1, p. 13].

**b.      Administrative Remedy 556951-R1-Al**

On December 17, 2009, Parks filed a BP-10, appealing a response to a BP-8 by Unit Manager Moulton. The BP-10 was rejected as untimely, and Parks was notified that he may resubmit his appeal in proper form within 10 days of the date of the rejection notice. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aii, Attachment L at 102 - R. 54-1, p. 14].

On January 14, 2010, Parks filed a BP-11 with the Central Office, appealing a response to an Informal Resolution Form (hereinafter "BP-8") by Unit Manager Moulton. On February 4, 2010, the BP-11 was rejected as untimely. Thus this claim was unexhausted. *Id.* at 107.

**c.      Administrative Remedy 557040-F1-R1**

On September 16, 2009, the Plaintiff filed a BP-9 appealing a response to an Informal Resolution Form (BP-8). [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aiii, Attachment L at 88 - R. 54-1, p. 14].

On September 21, 2009, the BP-9 was rejected as untimely. *Id*. On December 18, 2009, Parks filed a BP-10, appealing a response to a BP-8. On December 24, 2009, the Regional Office rejected the BP-10 because Parks failed to provide a copy of an Institution Administrative Remedy request (BP-9). Thus, this claim was unexhausted. *Id*. at 103.

#### d. ADMINISTRATIVE REMEDIES - AUGUST 18, 2009 INCIDENT

#### i. Administrative Remedy 559066-F1

On August 25, 2009, Parks filed an Informal Resolution Form (BP-8) at USP-McCreary. Parks complained that on August 18, 2009, Officer Gardner, by the order of Lt. Duck, used excessive force on him. Specifically, Parks alleged that Officer Gardner forced his arm behind his back while moving him in the SHU injuring his left shoulder and that he was not provided with medical attention. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aiva, Attachment M, Administrative Remedy No. 559066 - R. 54-1, p. 14].

On September 30, 2009, the Warden's Office received a BP-9 from Parks, expressing his dissatisfaction with the "non-response" to the BP-8 and reinstating the allegations in the BP-8. *Id.* On October 20, 2009, the Warden at USP-McCreary responded to the BP-9. The Warden advised Parks that allegations of staff misconduct are taken seriously and are thoroughly reviewed. The Warden also informed Parks that BOP policy prescribes appropriate actions if a violation occurs, but that inmates have no entitlement to the outcome of such reviews. The BP-9 was denied, and Parks was notified of his appellate rights. *Id.*

#### ii. Administrative Remedy 559066-R1

On November 3, 2009, the Regional Office received a BP-10 from Parks, stating his dissatisfaction to the BP-9 response and reinstating the allegations originally stated in the BP-8 and BP-9. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aivb, Attachment M, Administrative Remedy No. 559066 - R. 54-1, p. 15].

On November 30, 2009, the Regional Director responded to the BP-10. The Regional

Director notified Parks that the Bureau takes allegations of staff misconduct seriously and that the complaint was being investigated. Parks was reminded that investigations of staff are kept confidential, but that where there is a determination of a lapse in performance, action is taken. The appeal was denied, and Parks was notified of his right to appeal to the Central Office. *Id*.

### iii.      Administrative Remedy 559066-Al

On December 23, 2009, Parks filed a BP-11 with the Central Office, appealing the response to the BP-10. On January 21, 2010, the BP-1 1 was rejected, and Parks was provided the opportunity to resubmit his appeal in the proper form within 15 days from the rejection notice. Parks failed to resubmit the appeal; thus, this claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aivc, Attachment L at 104 - R. 54-1, p. 14].

### e.      ADMINISTRATIVE REMEDIES - AUGUST 24, 2009 - INCIDENT

### i.      Administrative Remedy 560801-F1

On September 27, 2009, Parks filed a BP-8, alleging that AW Messer purposely impeded, prevented, botched or thwarted his administrative remedy # 552988-F1 by telling him that he was only allowed to file one BP-8 complaint form at a time. Parks claims that AW Messer told him to choose as a matter of importance which complaint to file first. [*Id.*, Page ID #11-12, ¶¶ 62-68]. In response, Parks was notified that his allegation against a staff member could not be addressed at the BP-8 level. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Ava, Attachment N, Administrative Remedy No. 560801 - R. 54-1, p. 16].

On October 6, 2009, the Warden's Office received a BP-9 from Parks, expressing his dissatisfaction with the response to the BP-8 and reinstating the allegations in the BP-8. *Id*. On October 26, 2009, the Warden at USP-McCreary responded to the BP-9, advising Parks that

allegations of staff misconduct are taken seriously and are thoroughly reviewed. Parks was notified that BOP staff are subject to conduct regulations and are subject to appropriate action if misconduct occurs. Parks was also advised that inmates are not entitled to the results of staff investigations. The appeal was denied and the Plaintiff was notified of his appellate rights. *Id.*

### ii. Administrative Remedy 560801-R1

On November 6, 2009, the Regional Office received a BP-10 from Parks, stating his dissatisfaction to the BP-9 response and reinstating the allegations originally stated in the BP-8. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Avb, Attachment N, Administrative Remedy No. 560801 - R. 54-1, p. 17].

On November 19, 2009, the Regional Director responded to the BP-10. The Regional Director notified Parks that the BOP takes all allegations of staff misconduct seriously and that all BOP employees are subject to conduct regulations and that appropriate action is taken if a violation occurs. Parks was reminded that inmates are not apprised of the investigations. The appeal was denied, and Parks was informed of his right to appeal to the Central Office. *Id.*

### iii. Administrative Remedy 560801-Al

On December 23, 2009, the Central Office received a BP-11 from Parks, appealing the response to the BP-10. On January 21, 2010, the BP-11 was rejected, and Parks was provided the opportunity to resubmit his appeal in the proper form within 15 days from the rejection notice. Parks failed to resubmit the appeal; thus, this claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Avc, Attachment L at 104 - R. 54-1, p. 17].

### f. Administrative Remedy 564134-F1

On November 3, 2009, Parks filed a BP-9, claiming unprofessional/inappropriate conduct by staff.

On November 10, 2009, the BP-9 was rejected as untimely and for failure to attempt an Informal Resolution prior to submission of the Administrative Remedy or failure to provide evidence of an attempt at Informal Resolution. Thus, this claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Avi, Attachment L at 96 - R. 54-1, p. 18].

**g.      Administrative Remedy 572247-F1-R1**

On November 5, 2009, Parks submitted a BP-8, alleging that Counselor Lawson intentionally prevented him from filing Administrative Remedy 556951-F1, that he was refused to be provided with more than one grievance form, and that he had not been provided with envelopes.

On December 10, 2009, a response was provided to the BP-8. In that BP-8 response, Parks was notified that he had received envelopes on three different occasions. On January 5, 2010, Parks filed a BP-9, expressing his dissatisfaction with the response to the BP-8 and reinstating the allegations in the BP-8. On January 25, 2010, the Warden at USP-McCreary responded to the BP-9, wherein the Warden advised Parks that Unit Team staff devote significant time to every Informal Resolution and Administrative Request submission that they receive. In order to avoid redundancy, Informal Resolution forms are normally issued one at a time with each subsequent issuance following the completion and return of the previous one. Parks was advised that if he could demonstrate a compelling need, a modification to the standard practice may be made upon review. The Warden informed the Plaintiff of his right to appeal to

the Regional Office if he was dissatisfied with the response. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Avii, Attachment O at 104, Administrative Remedy No. 572247 - R. 54-1, p. 18].

### h.      Administrative Remedy 572247-R1

On February 4, 2010, the Regional Office received a BP-10 from Parks. On February 25, 2010, the Regional Director responded to the BP-10 and denied the appeal. Parks did not file a BP-11with the Central Office. Thus, this claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aviib, Attachment L at 109 - R. 54-1, p. 19].

### i.      Administrative Remedy 589165-F1

On May 7, 2010, Parks filed a BP-9 claiming misconduct by USP-McCreary staff regarding access to the Court. On the same date, this BP-9 was rejected because Parks was appealing more than one Incident Report in a single form, and the appeal was untimely. Thus, his claim was unexhausted. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Aviii, Attachment L at 114 - R. 54-1, p. 19].

### 2.      EXHAUSTED ADMINISTRATIVE REMEDIES

Only a portion of the incidents dated May 22, 2009 and May 23, 2009, appear to be properly exhausted. However, in order to obtain a global view of events that transpired while Parks was housed at USP-McCreary, the Court has also reviewed other exhausted remedies that are not raised in the Complaint. All of Parks' apparently exhausted remedies are reviewed below:

### i.      ADMINISTRATIVE REMEDIES - MAY 22, 2009 INCIDENT

### a.      Administrative Remedy 548817-F1

On May 25, 2009, Parks filed an Inmate Informal Resolution Form (BP-8), alleging that Case Manager Anderson was unprofessional and committed misconduct by allegedly refusing to contact the Parole Commission upon his request.  Parks also alleged that Case Manager Anderson retaliated against him by disclosing sensitive information about him  to another inmate, *i.e.*, whether he would be accepted back by general population after being found guilty of a violation of Code 205, Engaging in a Sex Act.  Parks claimed that her retaliation was in response to his telling her that he was going to file a grievance against her on the parole commission issue.  Finally, the Plaintiff also stated the same allegations that he raised in his complaint in regard to Case Manager Anderson, alleging that she retaliated by posting in the Unit Officers Station that the Plaintiff would not be allowed to go into the sanitation closet.  [*Id.*, Page ID #5-6, ¶¶ 16-23].  The response to the BP-8 stated that the allegations were without merit and that Parks had been counseled on his behavior and possible misconduct.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Biia, Attachment Q, Administrative Remedy No. 548817].

On July 17, 2009, the Warden received a BP-9 from Parks, stating that he was dissatisfied with the "non-response" to the BP-8 and reinstating the allegations in the BP-8 that Case Manager Anderson improperly discussed sensitive information about him with another inmate in retaliation for his wanting to file a grievance against her.  *Id*.

On August 7, 2009, the Warden responded to the BP-9 and advised Parks that allegations of staff misconduct are taken seriously and are thoroughly reviewed.  Parks was notified that all BOP staff are subject to conduct regulations and that appropriate action will be taken if a violation is found, but that inmates are not entitled to the outcome of such reviews.  Parks was

also advised that if he was unsatisfied with the response he could appeal to the Regional Office.
*Id.*

b.     **Administrative Remedy 548817-R1/R2**

On August 19, 2009, the Regional Office received Administrative Remedy Appeal (BP No. 548817-R1. Remedy 548817-R1 was voided on August 21, 2009, because it was originally sent to the wrong department, Correctional Services. On August 31, 2009, the BP-10 was properly filed in the Regional Office and accepted as Remedy No. 548817-R2. [Exhibit 1, Declaration of Carlos J. Martinez, at Attachment L, Administrative Remedy Generalized Retrieval Data at 85-87 - R. 54-1].

On September 23, 2009, the Regional Director responded to the BP-10. In his response, the Regional Director notified Parks that the Warden responded appropriately to his BP-9 in relation to his demand for an investigation for staff misconduct. The appeal was denied, and Parks was advised of his right to appeal the Regional Director's decision to the Central Office. *Id.*

c.     **Administrative Remedy 548817-Al**

On November 9, 2009, the Central Office received a BP-11 appealing the Regional Director's decision. In his appeal, Parks expressed his dissatisfaction with the BP-10 response and reiterated the allegations in his BP-9 and BP-10. On January 5, 2010, the Central Office rejected the BP-11 because Parks did not submit a complete set of the request or appeal form. Parks was provided with an opportunity to submit the BP-11 in proper form within 15 days of the date of the rejection notice. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iic, Attachment Q and Attachment L at 98 - R. 54-1].

### d.       Administrative Remedy 548817-A2

On January 25, 2010, the Central Office received the resubmission of the BP-11appealing the Regional Director's decision.  In the BP-11, Parks again expressed his dissatisfaction with the BP-10 response and reinstated the allegations in his BP-9 and BP-10.

On May 21, 2010, the National Appeals Administrator responded to the Plaintiff's BP-11 and notified Parks that allegations of staff misconduct are taken seriously and that his allegations were referred to the appropriate BOP office for review.  Parks was also advised that the results of the investigation and the action taken, if any, are not disclosed to inmates.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iid, Attachment Q - R. 54-1].

### ii.      ADMINISTRATIVE REMEDIES - MAY 23, 2009 INCIDENT

### a.       Administrative Remedy 547040-F1

On June 4, 2009, Parks filed an Informal Resolution Form (hereinafter "BP-8") at USP-McCreary.  Parks complained of retaliation and staff misconduct by Officer Jones. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8ia, Attachment P, Administrative Remedy No. 547040 - R. 54-1].  Parks made the same allegations he stated in the underlying Complaint regarding the May 23, 2009 incident.

On June 30, 2009, Correctional Counselor Straub responded to the BP-8 and informed Parks that due to the nature of his complaint, a copy of the informal resolution form was forwarded to the appropriate authorities.  *Id.*

On July 13, 2009, the Warden received a BP-9 expressing dissatisfaction with the response to the BP-8 and reinstating the allegations Parks made in the BP-8.  *Id.*  On August 7, 2009, the Warden at USP-McCreary responded to the BP-9.  The Warden advised Parks that

allegations of staff misconduct are taken seriously and are thoroughly reviewed. The Warden notified the Plaintiff that even though BOP staff are subject to conduct regulations, inmates are not entitled to the outcome of staff misconduct reviews. Finally, the Warden advised the Plaintiff of his right to appeal his response to the Regional Director. *Id.*

b.     **Administrative Remedy 547040-R1**

On August 19, 2009, the Regional Office received a BP-10. Parks voiced his dissatisfaction to the BP-9 response and reinstated the allegations originally made in the BP-8. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8ib, Attachment P - R. 54-1].

On September 18, 2009, the Regional Director responded to the BP-10. The Regional Director notified Parks that the Warden had properly addressed the issues Parks had raised and that his concerns were being reviewed. Parks was assured that if it were determined that there had been a lapse in performance by staff, appropriate action would be taken. The appeal was denied, and Parks was informed of his right to appeal to the general counsel. *Id.*

c.     **Administrative Remedy 547040-A1**

On October 8, 2009, the Central Office received a BP-11 reinstating the allegations raised in the BP-8, BP-9 and BP-10, and demanding monetary compensation and injunctive relief. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Bic, Attachment P - R. 54-1].

On January 26, 2010, the National Inmate Appeals Administrator notified Parks that the BOP takes allegations of staff misconduct seriously and that his allegations had been referred to the appropriate BOP department, but that the results of the investigation and the action taken, if any, are not disclosed to inmates. *Id.*

iii.     **ADMINISTRATIVE REMEDIES - UDC Hearing — Incident Report No. 1892145**

31

a.      **Administrative Remedy 552990-F1**

On August 12, 2009, Parks submitted a BP-9 to the Warden.  In his BP-9, Parks appealed the UDC hearing for Incident Report No. 1892145, arguing that he did comply with the program, that staff failed to call him in order to report, and that the Incident Report and sanctions were a tactic used by USP-McCreary to retaliate against him for filing complaints and grievances against his Unit Team.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iib, Attachment R, Administrative Remedy No. 552990 - R. 54-1].

On September 10, 2009, the Warden responded to the Plaintiff's allegations in the BP-9. The Warden advised Parks that a review of the Incident Report and UDC hearing revealed that all procedures were followed in accordance with the Program Statement on Inmate Discipline. The Warden denied the Request for Administrative Remedy and notified the Plaintiff of his right to appeal to the Regional Director.  *Id.*

b.      **Administrative Remedy 552990-R1**

On September 21, 2009, the Regional Director received Parks' appeal of the Warden's decision and rearguing the allegations in the BP-9.  On October 13, 2009, the Regional Director informed Parks that there was no evidence that staff did not follow proper policy and procedure and that the Warden accurately and adequately addressed the issues he had raised.  The Regional Director denied the appeal and advised the Plaintiff of his right to appeal.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iiib, Attachment R - R. 54-1].

c.      **Administrative Remedy 552990-Al**

Parks appealed the Regional Director's decision to the Central Office.  In his BP-11, Parks argued that he was dissatisfied with the response, claimed that the Incident Report was

issued in retaliation by staff for filing grievances, and he reiterated the claims made in the BP-9 and BP-10. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iiic, Attachment R - R. 54-1].

On February 19, 2010, the National Inmate Appeals Administrator informed Parks that there was substantial compliance with the Program Statement on Inmate Discipline and that the UDC's decision was based upon the greater weight of the evidence and that the evidence was sufficient to support the finding. The appeal was denied. *Id.*

iv. **ADMINISTRATIVE REMEDIES — UDC Hearing — Incident Report No. 1892388**

a. **Administrative Remedy 553007-F1**

On August 12, 2009, Parks submitted a BP-9 to the Warden. Parks appealed the UDC hearing for Incident Report No. 1892388, arguing that he did not receive impartial treatment by the UDC. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8iva, Attachment S, Administrative Remedy No. 553007 - R. 54-1].

On September 4, 2009, the Warden responded to the BP-9. He advised Parks that all proper procedures were followed by the UDC in accordance with the Program Statement on Inmate Discipline. The Warden found that there was substantial evidence to support sanctions for refusing to obey an order, in violation of Code 307. The BP-9 was denied, and Parks was advised of his right to appeal to the Regional Director. *Id.*

b. **Administrative Remedy 553007-R1**

On September 21, 2009, Parks appealed the Warden's denial of his BP-9 to the BOP's Regional Office. Parks reiterated the allegations in the BP-9. On October 25, 2009, the Regional Director informed Parks that there was no evidence that staff did not follow proper policy and procedure and that the Warden had accurately and adequately addressed the issues

Parks had raised in the BP-9. The Regional Director denied the appeal and advised Parks of his right to appeal to the Central Office. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8ivb, Attachment S - R. 54-1].

### c.    Administrative Remedy 553007-A1

On November 17, 2009, Parks submitted a BP-11 to the Central Office, appealing the Regional Director's decision. In his BP-11, Parks argued that he was dissatisfied with the response and realleged the issues in the BP-9. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8ivc, Attachment S - R. 54-1].

On March 25, 2010, the National Inmate Appeals Administrator responded, informing Parks that there was substantial compliance with the Program Statement on Inmate Discipline and that the UDC's decision was based upon the greater weight of the evidence and that the evidence was sufficient to support the finding. The appeal was denied. *Id.*

### v.    ADMINISTRATIVE REMEDIES — UDC Hearing - Incident Report No. 1903299

### a.    Administrative Remedy 559065-F1

On September 30, 2009, Parks submitted a BP-9 to the Warden, appealing Incident Report No. 1903299 and the UDC hearing. Parks argued that he was innocent of the charges in the Incident Report - insolence towards staff - and that the Incident Report was written in an attempt to cover up the use of excessive force claim that Parks allegedly filed against Officer Gardner and to retaliate against him for writing up staff. Parks also claimed that the UDC was not impartial and also attempted to cover up the alleged excessive use of force on August 9, 2009, and the alleged retaliation by staff against him. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8va, Attachment T, Administrative Remedy No. 559065 - R. 54-1].

On October 14, 2009, the Warden responded to the Plaintiffs allegations. The Warden advised Parks that all of the procedural safeguards were followed by the UDC in its review of Incident Report No. 1903299. Accordingly, the appeal was denied, and Parks was advised of his right to appeal to the Regional Office. *Id.*

b.     **Administrative Remedy 559065-R1**

Parks appealed the Warden's denial of his BP-9 to the Regional Office. On May 7, 2010, the Regional Director informed Parks that the UDC heard his denial of the incident and relied on the greater weight of the evidence to find that Parks committed the prohibited act. Parks was advised that the UDC afforded him with due process and that the required disciplinary procedures were followed. Parks' appeal was denied, and he was advised of his right to appeal the decision to the General Counsel. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8vb, Attachment T - R. 54-1].

c.     **Administrative Remedy 559065-Al**

On May 25, 2010, the Central Office received a BP-11 from Parks, appealing the Regional Director's decision. In his BP-11, Parks contended that the matter had not been thoroughly investigated and that the alleged "cover-up" was being accepted and "swept under the rug". Additionally, Parks reiterated the allegations in his BP-9 and BP-10. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8ivc, Attachment T - R. 54-1].

On October 15, 2010, the National Inmate Appeals Administrator informed Parks that the UDC complied with the procedural requirements in the Program Statement on Inmate

Discipline.  The Administrator found that the greater weight of the evidence supported the UDC's decision and that there was no evidence to support the Parks' allegations.  The appeal was denied.  *Id.*

## vi.     ADMINISTRATIVE REMEDIES - AUGUST 18, 2009 INCIDENT[2]

### a.     Administrative Remedy 560876-F1

On August 25, 2009, Parks filed an Inmate Informal Resolution Form (BP-8), alleging that on August 18, 2009, Officer Gardner, under the direction of Lieutenant Duck, used unreasonable and excessive force on him by forcing his left arm behind him injuring his left shoulder.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8via, Attachment U, Administrative Remedy No. 560876 - R. 54-1].

On October 9, 2009, the Warden received a BP-9 from Parks, voicing his dissatisfaction with the lack of response to the BP-8 and restating the allegations in the BP-8.  *Id.*  On October 28, 2009, the Warden responded to the BP-9.  The Warden advised Parks that allegations of staff misconduct are taken seriously and are thoroughly reviewed.  Parks was notified that all BOP staff are subject to conduct regulations and that appropriate action will be taken if a violation is found, but that inmates are not entitled to the outcome of such reviews.  Parks was advised that if he was unsatisfied with the response, he could appeal to the Regional Office.  *Id.*

### b.     Administrative Remedy 560876-R1

On November 19, 2009, Parks filed a BP-10 in the Regional Office, appealing the Warden's response to his BP-9 and reiterating the allegations in the BP-9.  On December 8,

---

[2] Plaintiff's Complaint does not allege excessive use of force by Gardner on August 18, 2009, but rather retaliation by Gardner on other grounds because the Plaintiff filed an unnecessary use of force claim against Gardner on or about August 9, 2009.

2009, the Regional Director responded to the BP-10, notifying Parks that the BOP takes allegations of staff misconduct seriously and that the Warden had advised the Plaintiff that his allegation had been referred to the appropriate BOP department. Once again, Parks was advised that staff investigations are kept confidential, and he was assured that where there was a determination of a lapse in performance, appropriate action would be taken. The appeal was denied, and Parks was advised of his right to appeal the Regional Director's decision to the Central Office. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8vib, Attachment U - R. 54-1].

**c.      Administrative Remedy 560876-Al**

Parks appealed the Regional Director's decision to the Central Office. In his appeal, Parks expressed his dissatisfaction with the BP-10 response and restated the allegations in his BP-9 and BP-10. The Central Office rejected the BP-11 because the appeal was not submitted in proper form. Parks was provided with an opportunity to resubmit the BP-11 in proper form within 15 days of the date of the rejection notice. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8vic, Attachment U and Attachment L at 106 - R. 54-1].

**d.      Administrative Remedy 560876-A2**

On March 24, 2010, the Central Office received the resubmission of the BP-11 appealing the Regional Director's decision. In the BP-11, Parks again expressed his dissatisfaction with the BP-10 response and reiterated the allegations in his BP-9 and BP-10. In addition, Parks requested monetary compensation.    On July 16, 2010, the National Appeals Administrator responded to the Plaintiff s BP-11 and denied the appeal. The Administrator notified Parks that all allegations of staff misconduct are taken seriously and that his allegations were referred to the appropriate BOP component for review. Parks was also advised that the administrative remedy

program does not provide for monetary relief.  The Administrator concurred with the responses in the BP-9 and BP-10. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8vid, Attachment U - R. 54-1].

**vii.    ADMINISTRATIVE REMEDIES — October 22, 2009 INCIDENT**

**a.    Administrative Remedy 564277-F1**

On October 23, 2009, Parks filed an Informal Resolution Form (BP-8), wherein he claimed that Officer Reans and Officer Davis used unnecessary and unreasonable force when they moved him from the DHO hearing back to his cell and removed his handcuffs.  Counselor Lawson responded to the BP-8 notifying Parks that he could not address the allegations raised in the BP-8.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8viia, Attachment V, Administrative Remedy No. 564277 - R. 54-1].

On November 6, 2009, Parks filed a BP-9, wherein he stated that he was dissatisfied with the response to the BP-8, and he restated the allegations in the BP-8.  *Id*.  On December 9, 2009, the Warden responded to the Plaintiffs BP-9.  In his response, the Warden advised Parks that allegations of staff misconduct are taken seriously and are thoroughly reviewed.  Parks was further advised that all BOP staff are subject to conduct regulations when a violation occurs, but that inmates have no entitlement in the outcome of such reviews.  Parks was notified of his right to appeal the Warden's response to the BOP's Regional Office.  *Id*.

**b.    Administrative Remedy 564277-R1**

Parks appealed the Warden's decision on his BP-9 to the Regional Office.  The BP-10 appealed the Warden's response and reiterated the allegations raised in the BP-8 and BP-9. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8viib, Attachment V - R. 54-1].  On January 25,

2010, the Regional Director responded to the appeal, informing Parks of the standards of employee conduct and that an investigation of his complaint revealed that on October 22, 2009, Parks did attend a DHO hearing in the Special Housing Unit but that there was no evidence that he was assaulted by staff or that staff failed to follow proper policy and procedures. Parks' appeal was denied, and he was advised of his right to appeal to the General Office. *Id.*

**c.      Administrative Remedy 564277-A1**

On February 16, 2010, the Central Office received a BP-11 from Parks, appealing the Regional Director's decision. In his appeal, Parks expressed his dissatisfaction with the BP-10 response, alleged a cover-up by health services staff, and restated the allegations in his BP-9 and BP-10. The Central Office rejected the BP-11 because the appeal was not submitted in proper form. Parks was provided with an opportunity to resubmit the BP-11 in proper form within 15 days of the date of the rejection notice. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8viic, Attachment L at 110 and Attachment V - R. 54-1].

**d.      Administrative Remedy 564277-A2**

On April 27, 2010, the Central Office received the resubmission of the BP-11 appealing the Regional Director's decision. In the BP-11, Parks again expressed his dissatisfaction with the BP-10 response, alleged a cover-up by health services staff, and renewed the allegations in his BP-9 and BP-10. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8viid, Attachment V - R. 54-1].

On October 6, 2010, the National Inmate Appeals Administrator responded to the BP-11.

In his response, the Administrator notified Parks that his allegations of staff misconduct are taken seriously and had been referred to another component of the BOP for appropriate action. *Id*.

### viii.    ADMINISTRATIVE REMEDIES —DHO Hearing - Incident Report No. 1906500

### a.    Administrative Remedy 568290-R1

On December 8, 2009, Parks submitted a BP-10 to the Regional Office, wherein he appealed the DHO hearing on October 22, 2009, regarding Incident Report No. 1906500.  Parks alleged that the DHO failed to follow the established policy and procedures for disciplinary hearings.  Parks also claimed retaliation and that the Incident Report had been issued against him because he had filed complaints and grievances against staff.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8viiia, Attachment W, Administrative Remedy No. 568 290 - R. 54-1].

On February 4, 2010, the Regional Director responded to the BP-10.  In that response, the Regional Director assured Parks that the required disciplinary procedures were substantially followed, that his due process rights had not been violated, and that the evidence supported the DHO's findings.  The appeal was denied, and Parks was notified of his right to appeal the response to the Central Office.  *Id.*

### b.    Administrative Remedy 568290-A1

On March 31, 2010, Parks appealed the Regional Office decision to the Central Office. In the BP-11, Parks expressed his dissatisfaction with the Regional Office response to the BP-10, renewed the claims in the BP-10, and requested monetary damages and injunctive relief from Central Office.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Bviiib, Attachment W - R. 54-1].

On August 11, 2010, the National Inmate Appeals Administrator responded and denied the appeal. In his response, the Administrator notified Parks that the DHO decision was based on the greater weight of the evidence. The Administrator found that the required disciplinary procedures were followed and that the evidence was sufficient to support the charge. For these reasons, the BP-11 was denied. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8Bviiib, Attachment W - R. 54-1].

**III.**

**A.      Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act of 1995 ("PLRA"), Congress amended 42 U.S.C. 1997e to make exhaustion of administrative remedies mandatory for prisoners. The statute now provides as follows:

> No action shall be brought with respect to prison conditions under 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

Therefore, a prisoner-plaintiff must first have exhausted "such administrative remedies as are available" prior to bringing a prison conditions action in a District Court. 42 U.S.C. §1997e(a). Shortly after the effective date of the statute, April 26, 1996, the United States Court of Appeals for the Sixth Circuit held that the language of 1997e means what it says, expressly requiring exhaustion of administrative remedies before bringing a civil action or appeal. *Wright v. Morris*, 111 F.3d 414 (6th Cir.1997), *cert. denied*, 552 U.S. 906 (1997). Thereafter, the Supreme Court of the United States has repeatedly confirmed that the statute requires the exhaustion of available administrative remedies before bringing a civil action or appeal in

District Court. *Booth v. Chumer*, 532 U.S. 731, 741 (2001)("Thus, we think that Congress mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."); *Porter v. Nussle*, 534 U.S. 516, 525 (2002)("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstance or particular episodes, and whether they allege excessive force or some other wrong"). Consequently, the Supreme Court held in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006), that the PLRA statute requires not only the exhaustion of the available administrative remedy process, but the proper exhaustion of that administrative remedy process. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 126 S.Ct. at 2386. Moreover, in *Woodford v. Ngo*, the Supreme Court discussed the purposes of exhaustion as stated in its earlier opinions and stressed that the benefits of exhaustion "can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have an opportunity unless the grievant complies with the system's critical procedural rules." *Id*. at 2388.

The BOP's four-tiered administrative remedy scheme, available to inmates who have a complaint about their confinement, is set out in Administrative Remedy Program Statement Number 1330.16 and 28 C.F.R. §§ 542.10-542.[11]

---

[11] The multi-step administrative remedies available to inmates confined in BOP institutions are set out in 28 C.F. R. §542.10-.19. Section 542.13(a) demands that an inmate first informally present his complaint to the staff [BP-8 form], thereby providing staff with an opportunity to correct the problem, before filing a request for an administrative remedy. If the inmate cannot informally resolve his complaint, then he may file a formal written request to the Warden [BP-9]. *See* §542.14(a). If the inmate is not satisfied with the Warden's response, he may appeal to the Regional Director [BP-10], and, if not satisfied with the Regional Director's response, the inmate may appeal that decision to the Office of General Counsel [BP-11]. *See* §542.15.

In the present action, the BOP's Administrative Remedies record reflects that Parks did not file and/or properly exhaust all of the Administrative Remedies relative to the claims dated June 4, 2009 (Complaint, Docket No. 2, ¶¶ 50-54); June 5, 2009 (*Id*., ¶¶ 55-61); June 6, 2009 (*Id*., ¶¶ 72-76); June 9, 2009 (*Id*., ¶¶ 77-78); June 14, 2009 (*Id*., ¶¶ 79-80); June 24, 2009 (*Id*., ¶ 81); July 16, 2009 (*Id*., ¶¶ 86-87); August 9, 2009 (*Id*., ¶¶ 119-121); August 18, 2009 (*Id*., ¶ 88ff); August 19, 2009 (*Id*., ¶¶ 104-107); August 20, 2009 (*Id*., ¶¶ 110-1 12); August 24, 2009 (*Id*., ¶¶ 62-68); October 15, 2009 (*Id*., ¶113); and October 22, 2009 (*Id.*, ¶¶ 114-115). [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8A, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

In his Complaint, Parks advised the Court that he "utilized" the prison's grievance process before filing the underlying complaint. However, he failed to specify which of his many claims he had exhausted and to show how he had exhausted those claims.[12] [Complaint, Docket No. 2, p. 4 , ¶6].

A review of the BOP's Administrative Remedy records reflects that Parks has filed 367 Administrative Remedies while confined in the BOP. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 5; Attachment L, SENTRY Administrative Remedies - R. 54-1]. While at USP-McCreary, Parks filed 73 Administrative Remedies. Of those Administrative Remedies, from May 2009 to May 2010, Parks only properly filed and/or exhausted Administrative Remedies

---

The administrative procedure includes established response times. §542.18. As soon as an appeal is accepted and filed, the Warden has 20 days to respond; the Regional Director, 30 days; and General Counsel, 40 days. Only one extension of time of 20-30 days, in writing, is permitted the agency. If the inmate does not receive a response within the allotted time, including extension, he may consider the absence of response as a denial at that level. *Id.*

[12] Parks failed to attach copies of the Administrative Remedies to the Complaint.

No. 547040 and 548817, neither of which addressed the incidents in the complaint dated June 4, 2009, June 5, 2009, June 6, 2009, June 9, 2009, June 14, 2009, June 24, 2009, July 16, 2009, August 9, 2009, August, 18, 2009, August 19, 2009, August 20, 2009, August 24, 2009, October 15, 2009, and October 22, 2009.  The unexhausted Administrative Remedies were deficient and thus properly rejected because Parks did not properly pursue and/or exhaust them.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8,  Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

In *Staples v. Dewalt*, 2009 WL 1505560 (E.D.Ky.2009), the district court noted that *Bivens* claims are exhausted through the BOP's four-step Administrative Remedy process.  The Court in *Staples* went on to find that the plaintiff could have, but did not, pursue the appropriate BOP administrative remedy process for a *Bivens* claim.  Thus, the Court found that the plaintiff failed to exhaust the pre-filing requirements for his *Bivens* claims and dismissed them.

In this case, Parks failed to initially file and/or properly exhaust several of the claims he raised in his Complaint pursuant to the requirements of the PLRA.  While Parks appears to have properly exhausted a portion of the incidents dated May 22, 2009,[13] and May 23, 2009,[14] he failed to file and/or properly exhaust administrative remedies for his remaining complaints.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

---

[13] Administrative Remedy 548817 [Exhibit 1, <u>Declaration of Carlos J. Martinez,</u>   Attachment L at 81, 85, 87, 98, 108, and Attachment Q - R. 54-1].

[14] Administrative Remedy 547040 [Exhibit 1, <u>Declaration of Carlos J. Martinez,</u>   Attachment L 80, 85, 92, and Attachment P - R. 54-1].

"Under *Ngo*, exhaustion of available administrative remedies must be in accordance with all of the provisions thereof." *Jackson v. Walker*, 2008 WL 559693, 9 (E.D.Ky.2008). "In *Ngo*, the Supreme Court made it clear that 42 U.S.C. 1997e(a) requires available administrative procedures to be completed properly, not in a self-designated hodgepodge of procedures taken from various parts of the regulations." *Walker*, 2008 WL 559693 at 9. See also *Staples v. Dewalt*, *supra* at 1 ("[T]he court must dismiss claims which have not been exhausted, and 'exhaustion' means 'proper exhaustion,' in conformity with the requirements of the administrative scheme,..."). "'Proper exhaustion' means that the plaintiff complied with the administrative 'agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Morton v. Daviess County Detention Center*, 2009 WL 960495, 2 (W.D.Ky.2009) *citing Woodford v. Ngo, supra*. See also *Cadogan v. Bell*, 2009 WL 1138506, 4 (E.D.Mich.2009)("Not only must the prisoner exhaust all available remedies but such exhaustion must be proper, including 'compliance with an agency's deadlines and other critical procedural rules.'") citing, *Woodford v. Ngo*, 126 S.Ct. at 2386.

Pursuant to the Supreme Court exhaustion requirements in *Woodford v. Ngo*, *supra*, Parks has failed to comply with the requirements of the PLRA in regard to several of his allegations. See *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007)(Notice of a claim alone is not sufficient after *Woodford v. Ngo*, which permits suit only after "proper exhaustion" of the administrative remedies); *Bailey-El v. Federal Bureau of Prisons*, 246 F. App'x 105, 107-08 (3d Cir.2007) (Plaintiff had no excuse for failing to follow the procedures for appeals); *Peterson v. Smith*, 2007 WL 4258210 (S.D. Ga.2007) (complaint dismissed for failure to properly exhaust,

the district court rejecting the argument that the defendants were sufficiently aware of his complaint because he sent them letters). "To exhaust a claim, a prisoner must proceed through all of the steps of a prison's or jail's grievance process, because an inmate 'cannot abandon the process before completion and claim that he has exhausted his remedies." *Morton v. Daviess County Detention Center, supra* at 2, citing *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir.1999). See also *Brewer v. Corrections Corp. of America*, 2010 WL 398979 (E.D.Ky.2010)("At its core, [*Woodford v. Ngo*], makes clear that prisoners cannot satisfy the PLRA's exhaustion [requirement] by filing an untimely or otherwise procedurally defective administrative grievance.").

Moreover, proper exhaustion promotes a number of desirable goals, including filtering out frivolous claims, giving the agency the opportunity to review its conclusions short of litigation, and developing a full and complete factual record which allows a district court to review the agency's final action. *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir.1988). "Proper exhaustion often results in the creation of an administrative record that is helpful to the court." *Barney v. Correctional Medical Services, Inc.*, 2009 WL 3711612, 12 (W.D. Mich.2009). The failure of Parks to properly and fully exhaust the available administrative remedies on all the issues raised in his Complaint denied the agency an opportunity to properly address his grievances and deprived this Court of an organized administrative record with a proper set of facts. In this case, Parks' failure to provide the Court with a proper record of exhaustion of remedies, forced the agency to search his administrative remedies records in order to determine which, if any, of his claims he had properly exhausted.

To reiterate, 42 U.S.C. § 1997e(a) requires a prisoner challenging conditions pursuant to 42 U.S.C. § 1983, *Bivens*, or other federal law to properly exhaust all available administrative remedies prior to filing suit in federal court. *Porter v. Nussle*, 534 U.S. at 532; *Wyatt v. Leonard*, 193 F.3d 876, 877-78 (6th Cir.1999); *Page v. Howard*, 2009 WL 1459518 (S.D.Ohio2009)("Supreme Court has made it clear that 'a prisoner must now exhaust administrative remedies even when the relief sought,... , cannot be granted by the administrative process'"). Moreover, the Supreme Court has closed the door on any arguments of futility, stating: "we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Chumer*, 532 U.S. at 741, n.6. See also *Richard v. United States*, 2007 WL 2965074 (E.D.Ky. 2007)("While there exists a 'futility exception' to the judicially-created exhaustion requirement for habeas corpus petitions, the Supreme Court expressly rejected the existence of such an exception for civil rights actions subject to the PLRA years ago."); *Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11thCir.1998)("[T]here is no longer discretion to waive the exhaustion requirement . . . and the courts cannot simply waive those requirements where they determine they are futile or inadequate."); *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000)("We are of the opinion that §1997e(a), as amended by the PLRA, completely precludes a futility exception to its mandatory exhaustion requirement.").

In conclusion, Parks did not provide any evidence that he properly exhausted his First, Fifth, Eighth or Fourteenth Amendment claims. Although a plaintiff need not provide proof that he has exhausted administrative remedies in his Complaint, pursuant to *Jones v. Bock*, 549 U.S. 199, 211 (2007), such failure is an affirmative defense under the PLRA.

A review of the numerous Administrative Remedies Parks has filed while confined at USP-McCreary, reflects that out of all of his conditions of confinement claims, he only partially exhausted two at best.[15]  The BOP administrative records evidence that Parks does not appear to have filed and/or exhausted the remaining claims[16] at the informal (BP-8), Institutional (BP-9), Regional (BP-10), and/or the Central Office (BP-1 1) level.  [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].  Thus, as to the unexhausted claims, Parks did not properly or fully exhaust the available administrative remedies prior to filing the underlying action, all in violation of the PLRA.  See *Jones v. Bock*, 549 U.S. 199 (2007)(where a complaint contains both exhausted and unexhausted claims, a District Court should proceed with the exhausted claims while dismissing the unexhausted claims.).  Moreover, a futility argument does not excuse Parks' failure to properly exhaust, and the fact that Parks successfully exhausted some of the administrative remedies he has filed demonstrates that he had a proper understanding of the exhaustion procedures.  Accordingly, the Defendants' Motion to Dismiss, as to the unexhausted claims, must be granted.  See *Cadogan v. Bell*, *supra* (Plaintiff did not properly exhaust his administrative remedies because he did not [administratively] grieve the allegations contained in his complaint); *Masters v. Dewalt*, 2006 WL 3004019, 2 (E.D.KY. 2006) ("the exhaustion requirement requires the prisoner to complete, not merely initiate, the grievance process prior to filing").  See also *Weiser v. Castle*, 2011 WL 322656 (E.D.Ky. 2011).

---

[15] Claims from: May 22, 2009 , and May 23, 2009.  The Court gives Parks the benefit of the doubt, as the partial exhaustion of the above mentioned claims is highly speculative since Parks failed to provide a coherent description of his claims and Administrative Remedies.

[16] Claims from: June 4, 2009, June 5, 2009, June 6, 2009, June 9, 2009, June 14, 2009, June 24, 2009, July 16, 2009, August 9, 2009, August 18, 2009, August 19, 2009, August 20, 2009, August 24, 2009, October 15, 2009, and October 22, 2009.

**B.      STATUTE OF LIMITATIONS**

*Bivens* claims in Kentucky have a one-year statute of limitations.  *Cox v. Treadway*, 75

F.3d 230, 240 (6th Cir.1996) citing *Collard v. Kentucky Board of Nursing*, 896 F.2d 179, 182

(6th Cir.1990).  The state statute of limitations for personal injuries governs claims under *Bivens*.

*Owens v. Okure*, 488 U.S. 235, 239-40 (1998).  Thus, Federal courts sitting in Kentucky

"borrow" Kentucky's one-year statute of limitations for personal injury claims.  See *Williams v.*

*Gregory*, 2008 WL 2230063, 3 (E.D.Ky.2008) citing K.R.S. § 413.140(1).  Accordingly, since

Parks' claims against the Defendants in the underlying case are *Bivens* claims, the Court must

apply Kentucky's one-year statute of limitations.

Under federal law, a claim accrues when the plaintiff knows, or has reason to know, of

the injury which forms the basis for the action.  *Ali v. Morgan*, 2009 WL 872896, 2

(E.D.Ky.2009) citing *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005).  See also *Dixon v.*

*Anderson*, 928 F.2d 212, 215 (6th Cir.1991)(courts look for the event that should alert a typical

lay person to protect his or her rights) *abrogated on other grounds by Wu v. Tysons Food Inc.*,

189 F. App'x 375, 379 (6th Cir. 2006); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir.1984)("A

plaintiff has reason to know of his injury when he should have discovered it through the exercise

of reasonable diligence.").

In the present action, the fourteen claims that Parks failed to properly exhaust via the

administrative remedy procedure, dated from June 4, 2009 to October 22, 2009, are barred by the

one-year statute of limitations.  Furthermore, Parks' claims regarding the May 22, 2009, incident

were exhausted by May 21, 2010, and his claims concerning the May 23, 2009, incident were

exhausted by January 26, 2010.  See *supra*, pp. 35-39.  Yet, Parks waited until December 27,

2010, to file complaint in district court [R. 2], and he waited until June 1, 2012, to move to amend his Complaint to sue the Defendants in their individual capacities. [R. 10].  Even allowing for liberal tolling of the statute of limitations while the claims were being administratively processed, Parks' delay in filing his District Court Complaint and Amended Complaint bars these two claims as well under the statute of limitations, as no tolling is applicable, as explained below.

## C.    NO TOLLING IS APPLICABLE

Because prisoners cannot bring suit in federal court until they have exhausted their administrative remedies, the running of the applicable statute of limitations can be tolled for the period during which a prisoner is exhausting "such administrative remedies as are available." *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir.2000); *Cuco v. Federal Medical Center*, 2006 WL 1635668 at * 23-26 (E.D.Ky.2006), *affd*, 2007 WL 4437958, 257 F. App'x 897 (6th Cir. 2007). However, in the present case, Parks failed to file and/or properly exhaust the available administrative remedies for the June 4, 2009, June 5, 2009, June 6, 2009, June 9, 2009, June 14, 2009, June 24, 2009, July 16, 2009, August 9, 2009; August 18, 2009, August 19, 2009; August 20, 2009, August 24, 2009, October 15, 2009, and October 22, 2009 claims.  Thus, no tolling is applicable and the claims remain untimely filed.

"In *Cuco*, the Court expressly rejected the argument that accrual of claims is deferred until completion of [the administrative remedies] process, but only tolled while the inmate *diligently* pursues exhaustion."  *Gross v. Bureau of Prisons*, 2008 WL 2280094, 3 (E.D.Ky.2008)

(emphasis added). "The Supreme Court has held that in order to satisfy the requirements that administrative remedies be exhausted prior to filing suit, those remedies must be exhausted properly and within the time frames required by the remedy process." *Woodford v. Ngo*, 126 S. Ct. at 2387-88. Parks failed to satisfy this requirement as he did not properly file and exhaust his available administrative remedies. Parks' failure to diligently pursue and exhaust the available administrative remedies is a proper basis for declining to equitably toll the running of the statute of limitations; hence, Parks' unexhausted claims are time-barred. See *Staples v. Dewalt*, *supra* (dismissing *Bivens* claims as untimely filed).

Once challenged, the burden of establishing a federal court's subject matter jurisdiction rests on the party asserting jurisdiction. *Williams v. Gregory*, *supra* at 3, citing *Thomason v. Gaskill*, 315 U.S. 442 (1942). Parks' Complaint and Amended Complaint must be dismissed. Alternatively, the Defendants are entitled to summary judgment.

## D. REMAINING ALLEGATIONS IN THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO ALLEGE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Federal Rules of Civil Procedure provide for defenses and objections to a complaint. Specifically, Rule 12(b)(6) provides for a defense due to the Plaintiff's failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the "factual allegations contained in a complaint must raise a right to relief above the speculative level." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir.2008) internal quotation marks omitted. Rule 12(b)(6) does not require a heightened fact pleading of specifics, but enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007). See also *CBC Companies, Inc. v. Equifax, Inc*., 561 F.3d 569, 571 (6th Cir.2009).

To successfully plead a civil rights action, it is not enough for a complaint to contain mere conclusory allegations of unconstitutional conduct by the defendants. It must set forth a specific factual basis for its constitutional claims. *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir.1986). Even a *pro se* plaintiff must plead his constitutional allegations with some requisite specificity. *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir.1989). See also *Handy v. Price*, 996 F.2d 1064,1068 (10th Cir.1993).

Parks' complaint fails in this respect. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 554, the Court, construing the requirements of Fed. R. Civ. P. 8(a)(2),[17] held that although complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Further, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

In *Ashcroft v. Iqbal*, 129 S.Ct.1937 (2009), the Supreme Court explained and expanded on *Twombly*. The Court stated that it must first be determined whether the complaint contains factual allegations, as opposed to legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 129 S.Ct. at 1949, citing *Twombly, supra* at 555(The Court must accept all well-pleaded factual allegations as true, but need not "accept as true a legal conclusion couched as a factual allegation."). Second, the Court stated that the facts that are pled must show a "plausible" claim for relief.

---

[17] Rule 8(a)(2) provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

"Determining whether a complaint states a plausible claim for relief will, .... , be a context specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown [n]'- 'that the pleader is entitled to relief.'" *Ashcroft*, 129 S.Ct. at 1950. While a complaint need not contain "detailed factual allegations," it must provide "more than an unadorned, the-defendant-unlawfully harmed-me accusation." *Id.*, at 1949. A complaint that tenders "naked assertion[s]" devoid of "further factual enhancement" will not do. *Twombly*, 550 U.S. at 546, 557.

1.      **PLAINTIFF FAILS TO MEET THE ESSENTIAL ELEMENTS OF A FIRST AMENDMENT RETALIATION CLAIM.**

"To establish a claim of First Amendment retaliation the Plaintiff must prove that (1) he engaged in protected conduct, (2) that the defendants took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [Plaintiff's] protected conduct." *Hill v. Lanpin*, 630 F.3d 468 (6thCir.2010) citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394, 398 (611 Cir.1999) *en banc*. "Moreover, a Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Jones v. Caruso*, 2011 WL 1467647, 8 (W.D.Mich.2011). See also *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir.2001).

In the case at bar, Parks has established a pattern of strategically utilizing the Administrative Grievance process in an effort to claim retaliation any time he is subjected to an administrative or disciplinary action. Parks' first retaliation claim asserts retaliation and harassment by Case Manager Anderson. Yet on the occasions that Parks alleges retaliation, May

22, 2009 and August 19, 2009, Case Manager Anderson had a valid penological interest of

investigating whether Parks would be accepted the by general population after being found guilty

of a violation of Code 205, Engaging in a Sex Act, or whether he would be facing any danger or

retaliation from the inmate population. Further, she was well within the scope of her duties as a

UDC member regarding Parks masturbating in front of female staff. [Ex. 3: Anderson Dec. ¶8-

11, Attachment C, Program Statement 5270.08, Inmate Discipline & Special Housing Unit;

Attachment D, August 19, 2009, Memorandum, Case Manager H. Anderson; Attachment E,

DHO Report No. 1906500]. Parks, an inmate with several disciplinary convictions for Engaging

in Sex Acts before female staff, also alleged that Case Manager Anderson was retaliating when

she posted in the Unit Officers Station that Parks would not be allowed to go into the sanitation

closet.[18] [Complaint, Docket # 2, Page ID #6, ¶¶ 20-22]. Parks has no right to hide inside a

sanitation closet in a Penitentiary, and Case Manager Anderson's decision, in direct response to

his activity of hiding inside a dark sanitation closet, was justified by legitimate penological

concerns to conclude that his conduct could cause a serious security risk to female staff. [Ex. 3:

Case Manager Anderson Dec., ¶ 10]. Plaintiff's allegation (Complaint ¶ 23) that Defendant

Anderson would try to transfer him to another facility if the DHO recommended a transfer does

not state an actionable claim for retaliation, as it does not satisfy any of the required elements

necessary to state a retaliation claim, as explained hereafter. Finally, Park's allegations about the

sanitation closet and threat of transfer were not administratively exhausted. [Exhibit 1,

Declaration of Carlos J. Martinez, at Attachment Q - R. 54-1]. In his BP-9, Parks made only

vague references to unprofessionalism and misconduct by Anderson, as well as alleging that she

_____

[18] Parks admits that he would use the sanitation closet as some sort of study room. [Complaint, -
Docket #2, Page ID #6, ¶21].

discussed sensitive information about him with another prisoner. *Id.* Parks made no reference in his BP-9 to the sanitation closet or to Anderson threatening to transfer him. *Id.* The BP-9, BP-10, and BP-11 Responses do not mention the sanitation closet or the threat of transfer. [*Id.* at Attachment Q]. Thus, these two claims against Anderson are barred for failure to exhaust administrative remedies.

Park's second retaliation claim encompasses his allegations for the August 9 to 20, 2009, and the October 15 to 22, 2009, incidents. [Complaint, Docket # 2, pp. 18-19, ¶¶ 119-126], all of which appear to address Incident Report No. 1906500 dated August 18, 2009. [Exhibit 1, Declaration of Carlos J. Martinez, at Attachment I - R. 54-1]. On August 18, 2009, Officer Bryant observed Parks in Unit 4B standing inside his cell looking at her while he was masturbating. *Id.* An Incident Report was written charging Parks with a violation of Code 205, Engaging in a Sexual Act. *Id.* An investigation was conducted on the same date, and Parks was advised of his rights. *Id.* The investigation revealed that Parks was appropriately charged and the Incident Report was referred to the UDC. *Id.* On August 19, 2009, a UDC hearing was held which was presided over by Counselor Wood and Case Manager Anderson, regular members of the UDC. [Ex. 4: Counselor Wood Dec., ¶ 8, Attachment D, DHO Report No.1906500]; [Ex. 3: Case Manager Anderson Dec., ¶8, Attachment E, DHO Report No. 1906500]. The UDC referred the charges to the DHO for further hearing. *Id.* Parks requested that Dr. Willard act as his staff representative. [Ex. 5: Dr. Willard Dec., ¶ 6, Attachment C, Incident Report No. 1906500].

On October 22, 2009, the DHO hearing was held for Incident Report No. 1960500. *Id.* at 7, Attachment C. At the hearing, Parks called PA West, Lt. Alexander, Lt. Hardin, Officer Gardner, and inmate Thompson as witnesses. *Id.* at Attachment C. PA West testified that Parks

did not have any medical condition which would have prevented him from committing the sexual act. [Ex.2: PA West Dec., ¶¶7-9; Ex. 15: Dr. Velazquez Dec. at ¶ 3 and Attachment B, Medical Records]. Lt. Alexander testified that he remembered the incident, and Lt. Hardin opined that Parks was saying that he was going to hurt himself to draw attention away from the charge. [Ex. 10: Lt. Hardin Dec., ¶¶ 8-9, Attachment B, DUO Report No. 1906500]. Officer Gardner remembered that the Plaintiff received an incident report for engaging in a sexual act and that he later spoke to psychology. [Ex. 9: Officer Gardner Dec., ¶9, Attachment C, DHO Report No. 1906500].

After hearing all of the evidence. the DHO found that the greater weight of the evidence supported the charge and that the Plaintiff committed the prohibited act of engaging in a sexual act, in violation of Code 205. [*Id*. at DHO Report No. 1906500]. Parks has no right to masturbate in front of female staff, and he was charged of this code violation and administratively prosecuted in direct response to his illegal activity. The Incident Report and all of the circumstances surrounding it were justified by the legitimate penological concern that his conduct could cause a serious security risk to female staff and scarcely constituted retaliation for Plaintiff's prior grievances.

**a.      Protected Conduct**

While prisoners have a First Amendment right to file grievances against prison officials, if the grievances are frivolous they are not constitutionally protected. *Herron v. Harrison*, 203 F.3d 410, 415(6th Cir.2000); *Hill v. Lappin*, 630 F.3d at 472. See also *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir.2007)(The right is qualified, an inmate does not have a constitutionally protected right to file frivolous grievances.); *Smith*, 250 F.3d at 1037 (Filing a grievance is

constitutionally protected conduct under the First Amendment, but only if the grievance is not frivolous).

From May 2009 to May 2010, Parks filed more or less 73 Administrative Remedies at USP-McCreary.  See [Exhibit 1, Declaration of Carlos J. Martinez,- R. 54-1].  Most, if not all, of these grievances appear to have been filed in reaction to appropriate disciplinary actions taken by BOP staff against him.  "While a prisoner has every right to resolve legitimate disagreements with prison staff through the prison's grievance process, his use of the same process as a weapon against staff members based upon frivolous allegations is not constitutionally-protected conduct which can support a retaliation claim." *Antonelli v. Rios*, 2009 WL 790171, 6 (E.D.Ky. 2009) citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996).  For every Incident Report filed against him and discipline imposed upon him at USP-McCreary, Parks responded by filing grievances containing unsubstantiated allegations of retaliation.  Parks has a pattern of getting in disciplinary trouble and then alleging that the disciplinary action taken against him by staff is retaliatory due to his predisposition to file grievances against staff.

Parks' Administrative Grievances concerning the two exhausted claims from the incidents dated May 22, 2009, and May 23, 2009, are all frivolous in that he challenged or appealed valid disciplinary actions, due to his disruptive behavior. [Exhibit 1, Declaration of Carlos J. Martinez, at Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

Parks' two exhausted claims, as well as his unexhausted claims, are substantively meritless.  To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that he engaged in constitutionally-protected conduct, and motivated by that conduct, the defendant

took adverse action against him.  *Hill v. Lappin*, 630 F.3d at 472.  With respect to the first element, generally "[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."  *Herron v. Harrison*, 203 F.3d at 415.  But, this conduct is not protected if the underlying grievance is frivolous.  *Lewis v. Casey*, 518 U.S. at 353 n.3.  It is clear that Parks' grievances regarding the response of staff to his many disciplinary and behavioral issues are frivolous.  Parks filed grievances against properly founded disciplinary actions and/or proper responses by staff to his behavioral problems. [Exhibit 1, Declaration of Carlos J. Martinez, at Attachment B, Inmate Disciplinary History - R. 54-1].

Because Parks has no constitutional right to press frivolous grievances, a retaliation claim predicated upon such a grievance fails as a matter of law.  *Thomas v. Eby*, 481 F.3d at 440; *Herron*, 203 F.3d at 415; *Savage v. Sims*, 2012 WL 1084200, 6 (E.D.Ky.2012), *aff'd.* Court of Appeals No. 12-5377/5487 (6th Cir. 2013) [No. 6:11-11—GFVT, R. 69, Mandate,]; *Antonelli v. Crow*, 2012 WL 4215024, 17 (E.D.Ky 2012).

To the extent that Parks predicates his retaliation claim upon alleged adverse actions taken by prison officials in response to disciplinary behavior, his claim must fail as a matter of law, as such conduct is not constitutionally protected.  *Antonelli v. Rios*, *supra*, 6-7.

The grievances filed by Parks are based on frivolous allegations of retaliation by staff; thus, they are not constitutionally protected conduct under the First Amendment.  See *Smith v. Lief*, 2010 WL 41 1134, 5 n.8 (E.D.Ky2010)(Prisoners who threatened to file frivolous grievances not engaged in protected conduct) citing *Scott v. Kilchermann*, 2000 WL 1434456, 2 (6th Cir.2000).

**b.**     **Adverse Action**

"An adverse action is one that is capable of deterring a person of ordinary firmness from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d at 472 citing *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir.2002). The adverseness inquiry is an objective one, and does not depend on how a particular plaintiff reacted. *Green v. Caruso*, 2011 WL 1113392, 9 (W.D.Mich.2011). While the Plaintiff need not show actual deterrence, *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir.2002), certain deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Green v. Caruso*, *supra* at 9. See also *Thaddeus-X v. Blatter*, *supra,* at 396, 398.

A transfer from one Unit to another Unit and/or from one cell to another cell does not constitute an Adverse Action. "'Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct.'" *Jones v. Caruso*, 2011 WL 1467647 (W.D.Mich,2011) citing *Siggers-EL v. Barlow*, 412 F.3d 693, 701 (6th Cir.2005). See also *Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir.2003)("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.").

Moreover, while the Sixth Circuit in *Hill v. Lappin*, *supra*, found that a transfer to administrative segregation or a "lock-down" unit can be sufficient to constitute an adverse action, Parks' Administrative Detention was due to valid disciplinary sanctions and would not have deterred a person of ordinary firmness from exercising his First Amendment rights. *Baker v. Meko*, 2008 WL 4889614, 4 (E.D.Ky.2008)("...[A]dministrative Detention for temporary time periods would not impose an 'atypical and significant hardship in relation to the ordinary

incidents of prison life.'") citing *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir.1998)(two and one-half years in segregation during investigation of prisoner's involvement in riot did not deprive him of liberty interest without due process). Moreover, the placement of Parks in Administrative Detention did not impinge upon his ability to file grievances in prison as evidenced by his extensive Administrative Grievance Record. See *Hoffmeyer v. Rose*, 2011 WL 834059, 2 (N.D. Ohio.2011)("Placement on modified access status does not impinge upon a prisoner's ability to file meritorious grievances in prison."). Here, Parks cannot credibly argue that the alleged adverse action inhibited his ability to file grievances or access the court in any way, as evidenced by the fact that during his Administrative Detention due to prohibited conduct, he continued to aggressively pursue his First Amendment Rights and other constitutional rights by filing several Administrative Remedies at USP-McCreary and the present lawsuit. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

Moreover, "[a]n inmate cannot immunize himself from adverse administrative action by prison officials merely by filing grievances and then claiming that everything that happens to him is retaliatory... [i]f that were so, then every prisoner could obtain review of non-cognizable claims merely by filing a lawsuit or grievance and then perpetually claiming retaliation." *Antonelli v. Rios*, *supra* at 7, citing *Reinholz v. Campbell*, 64 F.Supp.2d 721, 733-34 (W.D.Tenn.1999). The manner in which Parks strategically files his retaliation claims suggests that they are simply a preemptive strike, filed as a way to immunize Parks from any future adverse disciplinary actions. In short, his apparent *modus operandi* is to assert claim of

retaliation against prison officials whenever *any* adverse or disciplinary action is taken against him after his has filed a grievance, regardless of the legitimacy of the retaliation claim.

### c.      Motivation for Adverse Action

For a retaliation claim to survive summary dismissal, the prisoner must establish that the adverse action was motivated at least in part by the prisoner's protected conduct.  *Siggers-El*, 412 F.3d at 699.  This element addresses the defendant's subjective motivation for taking the alleged adverse action.  *Thaddeus-X*, 175 F.3d at 399.  The Plaintiff must demonstrate that the motivation for taking the adverse action was at least in part to retaliate against a prisoner for engaging in protected conduct.  *Id*. at 399.

> ...,[T]he mere fact that a prisoner has been on the opposite side of prison officials in numerous adversarial contexts, whether disciplinary hearings, prisoner grievances, or litigation, does not without more, demonstrate that any (or all) actions of prison officials are taken in retaliation for the prisoner's opposing stance; it may simply demonstrate the prison official's belief, whether correct or not, that the prisoner has violated prison rules, or vice versa. The Court cannot accept a prisoner's invitation to infer retaliatory motive based solely on bare assertions of retaliation or the mere proximity of events.

*Antonelli v. Rios*, *supra*, citing *Garrett v. Angelone*, 940 F.Supp.933, 944 (W.D.VA.1996), *aff'd*, 107 F.3d 865 (4th Cir.1997).

Therefore, some evidence of retaliatory motive is required, and conclusory allegations of retaliatory motive unsupported by material fact are insufficient to state a claim.  See *Harbin-Bey*, 420 F.3d at 580.  Moreover, while temporal proximity between filing grievances and the adverse action may provide some support for establishing retaliatory motive, the Sixth Circuit has been reluctant to find that such evidence alone establishes retaliatory motive.  See *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir.2004)(Conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive.).

In the underlying case, Parks' allegations as to motivation are wholly conclusory. While it is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence, see *Harbin-Bey*, 420 F.3d at 580, merely alleging the ultimate fact of retaliation is insufficient, *Murphy v. Lane*, 833 F.2d 106, 208 (7th Cir.1987), and conclusory allegations of retaliatory motive unsupported by material fact are insufficient to state a claim under *Bivens*. *Ashcroft v. Iqbal*, *supra*. Moreover, where prison officials provide a rational, neutrally-motivated explanation for their conduct, a prisoner must do more than respond with speculation. See *Antonelli v. Rios*, *supra,* at 8; *Smith v. Campbell*, *supra*, at 1037.

Parks attempts to demonstrate a retaliatory motive by simply filing a complaint which fails to address the facts of the relevant Incident Reports and disciplinary actions, and which omits any discussion of the reasons for the Incident Reports and disciplinary sanctions.[19] In the absence of any evidence and facts, it is easy to claim retaliation. However, when the facts in the Incident Reports and the DHO reports are reviewed, the reasons surrounding the disciplinary actions surface, and Parks' claim of retaliation disintegrates. Parks cannot demonstrate a retaliatory connection between the filing of his various grievances and the Incident Reports and/or the disciplinary actions that had to be enforced by prison staff due to his own disruptive behavior, *i.e.*, insolence to staff, disobeying direct orders, and masturbating in front of female staff members. Actions taken by prison personnel due to legitimate penological concerns do not constitute retaliation regardless of whether Parks had previously filed any grievances. See *Talbert v. Hinkle*, 961 F. Supp.904 (E.D. Va.1997)(rejecting retaliation claim by inmate who showed senator's letter to other inmates where prison officials demonstrated that his segregation

---

[19] Parks does not even mention which Incident Report to which he refers his Complaint and requests that all details be discussed "in camera".

and transfer, while done in direct response to his activity, was justified by legitimate penological concern that his conduct would cause unrest within prison creating potentially serious security risk).

With a rational, neutrally-motivated explanation for the Defendants' actions, the neutrally-justifiable grounds for the actions, and the Defendants' justified legitimate penological concern for their actions all demonstrate that the Defendants' motivation for taking the "adverse action" was not retaliation for engaging in protected conduct and negates all viability to Parks' retaliation claim.

**d.      No Actual Injury**

Finally, Parks has suffered no injury from the alleged retaliatory action.  The placement of an inmate in a different Unit, in the SHU, the transfer to another institution, or the loss of privileges does not constitute an injury, nor is it a constitutional violation.  First, inmates have no constitutional right to placement in a particular prison facility.  See *Silverburg v. Seeley*, 2009 WL 5197870 (W.D.Ky.2009)(A prisoner has no inherent constitutional right to be confined in a particular prison) citing *Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983); *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir.1995)(inmate has no constitutional right to be transferred from one institution to another).  Further, the BOP retains wide discretion in determining where to place an inmate under 18 U.S.C. 3621(b).

Second, "[T]he transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) *overruled on other grounds by*, *Sandin v. Conner*, 515 U.S. 472 (1995); *Olim*, 461 U.S. at 245-46; See also *Meachum v. Fano*, 427 U.S.

215, 224-25 (1976); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir.2003) (finding that loss of privileges and placement in segregation does not give rise to a protected liberty interest).

Third, a prisoner does not have a constitutional right to commissary or telephone privileges. "Well-established case law in the Sixth Circuit holds that the loss of such [commissary or telephone] privileges does not 'impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'..." *Sheppard v. Baker*, 2009 WL 260998, 2, (E.D.Ky. 2009) citing *Weinberger v. United States*, 268 F.3d 346, 361 (6th Cir.2001). See also *Smith v. Roper*, 12 F. App'x. 393, 396 (7th Cir.2001), *cert. denied*, 534 U.S. 1093 (2002)("In light of *Sandin*, the deprivations that [the inmate-plaintiff] suffered as a result of the disciplinary proceedings-namely, 22 days in segregation, a six-month loss of privileges associated with his demotion to C class, and six days without phone privileges-do not implicate a liberty interest."); *Freitas v. Ault*, 109 F.3d 1335, 1337-38 (8th Cir.1997)(finding that an involuntary transfer to a higher-security facility and loss of work and phone privileges did not constitute atypical and significant hardship); *Principio v. McGinnis* 2007 WL 2344872, * 2 (W.D.N.Y. Aug. 15, 2007)(finding that "60 days of keeplock with loss of telephone, packages, recreation and conjugal visits," was not an atypical or significant hardship); *Richardson v. Johnson*, 2001 WL 360843, *1 at n.1 (N.D.Tex. Apr. 5, 2001)(finding that phone-privilege restrictions, like commissary and recreation restrictions, do not impose a significant or atypical hardship on the inmate in relation to the ordinary incidents of prison life); *James v. Odom*, 2000 WL 1136563, 5 (S.D.Ala.May 30, 2000)(finding a 45-day restriction on inmate's "store, phone, and visiting privileges" did not constitute an atypical or significant hardship).

Finally, the "alleged" retaliation did not deter Parks from exercising his First Amendment rights, as evidenced by his subsequent and continuous filing of numerous Administrative Remedies and the present civil action. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 8, Attachment L, Administrative Remedy Generalized Retrieval Data - R. 54-1].

Accordingly, Parks fails to state a valid First Amendment claim as he fails to: 1) plead a constitutional violation with the requisite specificity; 2) establish the essential elements of a First Amendment violation claim; 3) establish how each Defendant personally deprived him of his First Amendment constitutional rights; and 4) establish an actual injury, since the alleged deprivations do not rise to the level of being constitutional violations. Thus, the Complaint must be dismissed in its entirety for failure to allege a claim upon which relief can be granted pursuant to Fed.R.Civ.P.12(b)(6). Alternatively, the Defendants are entitled to summary judgment.

### DEFENDANTS' LACK OF PERSONAL ACTION AND INVOLVEMENT

Plaintiff's allegations as to the cause of the adverse action are wholly conclusory and allege no facts beyond being purely speculative. Liability for violation of one's civil rights cannot be imposed on any defendant absent that defendant's personal actions. *Hicks v. Dewalt*, 2008 WL 2859031, 4 (E.D.Ky.2008). The plaintiff must describe how each individual defendant acted personally to deprive him of his constitutional rights. *Rizzo v. Goode*, 423 U.S. 362, 377 (1976). Bare conclusory allegations that a defendant personally deprived a plaintiff of constitutional or statutory rights are insufficient. *Hall v. United States*, 704 F.2d 246, 251 (6th Cir.1983); *Hicks v. Dewalt*, *supra* at 4. Moreover, a defendant's statements or conduct are not evidence of retaliation if the defendant is not the decision-maker taking the alleged adverse action. *Smith*, 250 F.3d at 1038.

### i.        Case Manager Anderson

In his May 22, 2009 claim, Parks claimed retaliation and harassment by Case Manager Anderson. [Complaint, Docket # 2, Page ID#5-6, ¶¶ 16-22]. Parks fails to establish that Case Manager Anderson was personally involved in a conspiracy to retaliate against him. Parks concludes, with no supporting evidence, that Case Manager Anderson informed a member of the general population about private matters (the reason for his disciplinary action) in order to retaliate against him. *Id.*, ¶ 22. Parks also concludes that Case Manager Anderson retaliated against him by not letting him use a sanitation closet as his private office. *Id.*, ¶¶ 20-21.

Parks fails to describe how Case Manager Anderson acted personally to deprive him of his constitutional rights. Case Manager Anderson had valid penological reasons for her actions, which were entirely non-retaliatory. As Case Manager, she had a duty to verify whether Parks would be accepted by the population of her Unit after being found guilty of a violation of Code 205, Engaging in a Sex Act, or whether he would be facing any danger or retaliation from the inmate population. [Ex. 3: Case Manager Anderson Dec., ¶ 11, Attachment B]. In addition, Case Manager Anderson had a valid penological reason not to let any inmate, especially an inmate with a history of engaging in sex acts before female staff, "hide" in a sanitation closet. [Ex. 3: Case Manager Anderson Dec., ¶ 10, Attachment B].

Moreover as a Case Manager, Anderson is a member of the Unit Disciplinary Committee (UDC), and part of her duties is to subject inmates under her care to disciplinary actions. [Ex. 3: Case Manager Anderson Dec., ¶¶ 6-7, Attachment C, Program Statement 5270.08, Inmate Discipline and Special Housing Unit]. Parks again concludes, with no supporting evidence, that Case Manager Anderson retaliated against him by finding him guilty at a UDC hearing. Parks

attempts to establish that Case Manager Anderson was personally involved in a conspiracy to retaliate against him simply because she was performing her duties as a Case Manager in a penitentiary. Bare conclusory allegations that a defendant personally deprived a plaintiff of constitutional or statutory rights are insufficient to establish a constitutional claim.

## ii.      Counselor Wood

In the absence of any evidence, Parks asserts that Counselor Wood entered into a conspiracy to retaliate against him by being part of the UDC that presided over several of his disciplinary actions. As Counselor and member of the Unit Team, Wood is part of the UDC. His duties include subjecting inmates under his care to disciplinary actions if needed. [Ex. 4: Counselor Wood Dec., ¶¶ 6-7, Attachment C, Program Statement 5270.08, Inmate Discipline and Special Housing Unit]. Parks again jumps to an unfounded conclusion that because Counselor Wood found him guilty at a UDC hearing, he was retaliating against him and/or was part of a conspiracy to retaliate against him. Parks simply attempts to establish that Counselor Wood was personally involved in a conspiracy to retaliate against him because he was fulfilling his duties as a Counselor at USP-McCreary. Bare conclusory allegations that a defendant personally deprived a plaintiff of constitutional or statutory rights are insufficient to establish a constitutional claim.

## iii.     Defendants Dr. Willard and PA West

In the absence of any supporting evidence, Parks claims that Dr. Willard and PA West entered into a conspiracy to retaliate against him. In the underlying case, Dr. Willard and PA West merely did their respective jobs as medical staff and were not decision makers in the undertaking of the alleged adverse action. Dr. Willard simply acted as a staff representative for

Parks during the October 22, 2009 DHO hearing for Incident Report No. 1906500. [Complaint, Docket # 2, Page ID #17-18, ¶¶ 108-115]. Dr. Willard fulfilled her duties as staff representative by contacting the witnesses for Parks, providing them with Parks' inquiries, and presenting them at the DHO hearing. [Ex. 5: Dr. Willard Dec., ¶¶ 6-7, Attachment C, Incident Report 1906500].

The Plaintiff called staff members PA West, Lt. Alexander, Lt. Hardin, and Officer Gardner as his witnesses (*Id.*, Attachment C), and when he was dissatisfied by their testimony he proceeded to blame Dr. Willard for retaliation and harassment in her performance as his staff representative. As a staff representative, Dr. Willard could not control or influence the responses from the witnesses or the decision by the DHO. [Ex. 5: Dr. Willard Dec., ¶ 7]. The fact that the Plaintiff was dissatisfied by the testimony of his witnesses does not establish a conspiracy to retaliate. [Complaint, Docket # 2, Page 17, ¶ 114]. Moreover, the allegations that Dr. Willard purposely delayed the proceedings in an attempt to "botch" Parks' disciplinary process has no factual basis as any delays were due to his own request for additional witnesses. Moreover, all of Parks' witnesses were available at the hearing, which mooted any alleged prejudicial effect. [Ex. 5: Dr. Williard Dec., ¶¶ 7-8, Attachment C, Incident Report 1906500].

Similarly, PA West merely acted as a staff witness on Parks' behalf during the October 22, 2009 DHO hearing for Incident Report No. 1906500. [Ex.2: PA West Dec., ¶ 8]. With no proof, Parks alleges that PA West lied about Parks' ability to masturbate on August 18, 2009 due to his "medical problem". [Complaint, Docket # 2, Page 16, ¶¶ 105-107]. Parks, without the benefit of any supporting evidence, alleges that he was accused of doing an act (masturbation) that he "cannot perform" and that PA West joined the "conspiracy to retaliate," harass, and/or deny due process by making misleading statements to the DHO that contradicted

the findings placed in Parks' medical file. [Complaint, Docket # 2, Page 16, ¶¶ 105-107]. The medical record evidences that PA West examined Parks' penis for lesions on August 19, 2009, and that he never addressed Parks' ability to masturbate. As a matter of fact, during the August 19, 2009 examination, PA West found that the lesions on Parks' penis had been ruptured within 24 hours and counseled him on sexually transmitted diseases and high-risk sexual behavior, demonstrating that PA West had no doubt in Parks' ability to perform sexual acts. [Ex. 2: PA West Dec., ¶¶ 7-9; Ex. 15: Dr. Velazquez Dec. ¶ 3 and Attachment B, Medical Records]. Parks erroneously assumed that PA West would state that he could not perform a sexual act on August 18, 2009 due to his lesions, but to his discontent, the examination did not reveal such a finding. Thus, contrary to the medical evidence, Parks claims that PA West committed perjury in order to further the alleged "conspiracy" by staff to retaliate.

Moreover, Dr. Willard and PA West had no role in the investigation and/or in the decision-making process for sanctioning Parks for his disciplinary violation. Their respective roles at the DHO hearing were simply as staff representative for Parks and witness for Parks. [Ex. 2: PA West Dec., ¶¶ 6-10; Ex. 5: Dr. Willard Dec., ¶¶ 6-8, Attachment C, Incident Report No. 1906500]. The fact that Parks did not like their testimony and/or was dissatisfied with the assistance they provided does not support his allegations of retaliation, nor does it establish that the Defendants personally deprived him of a constitutional right.

iv.    **Officer Bryant**

Parks claims that Officer Bryant filed a false Incident Report as part of a conspiracy to retaliate against him because he had filed complaints against "her friends and co-workers." [Complaint, Docket # 2, Page ID#14-15, ¶¶ 89-98]. Incident Report 1906500 was issued by

Officer Bryant because on August 18, 2009, she caught Parks in Unit 4B standing inside his cell looking at her while masturbating. Officer Bryant wrote an Incident Report charging Parks with a violation of Code 205, Engaging in a Sexual Act. [Ex. 7: Officer Bryant Dec., ¶¶ 6,7, Attachment B, Incident Report 1906500]. When the facts surrounding the reason for Incident Report No. 1906500 are revealed, Parks' retaliation claim fails, as he cannot establish that Officer Bryant acted personally to deprive him of a constitutional right. Parks' unsupported and conclusory allegations against Officer Bryant are insufficient to establish a claim that Officer Bryant personally deprived him of a constitutional right.

**v.    Counselor Straub**

In the absence of any supporting evidence, Parks claims that Counselor Straub was involved in a conspiracy with Officer Bryant to prepare a false Incident Report against him and that he purposely conducted a "poor" investigation of the Incident Report in order to "further" the conspiracy to retaliate against him. [Complaint, Docket # 2, Page ID#15-16, ¶¶ 97-103].

Counselor Straub was assigned the investigation of Incident Report No. 1906500.[20] In fulfillment of his duties, Counselor Straub advised Parks of his rights, took a statement from Parks, and reviewed the allegation by Officer Bryant. Counselor Straub concluded that Parks was properly charged and forwarded the Incident Report to the UDC/DHO for disposition. [Ex. 8: Counselor Straub Dec., ¶ 7, Attachment C, DHO Report 1906500]. Pursuant to his duties, Counselor Straub investigated Incident Report No. 1906500 and made a decision based on the facts available to him. Other than Parks' conclusory allegations, there is no evidence to support

---

[20]   Counselor Straub also investigated Incident Report No.1903299. [Ex. 8: Counselor Straub Dec., ¶ 6, Attachment B, Incident Report No. 1903299].

his claim that Counselor Straub purposely conducted a poor investigation in order to retaliate against him. Plaintiff's bare-boned, unsupported, and conclusory allegations are insufficient to establish that Counselor Straub was personally involved in a conspiracy to deprive him of a constitutional right.

**vi. Officer Gardner**

Parks claims that Officer Gardner made false statements when he testified in the October 22, 2009, DHO hearing for Incident Report No. 1960500 in retaliation for Parks having previously filed grievances against Gardner. [Complaint, Docket # 2, Page 18, ¶¶ 116-118]. Again, Parks' allegations against staff have no foundation and/or basis to support a claim of retaliation.

First, Officer Gardner testified at the DHO hearing at Parks' request. Parks trusted Officer Gardner enough to ask him to testify on his behalf regardless of the fact that he had allegedly previously filed a grievance against him.[21] Even though Officer Gardner apparently was not one of the officers who came to Unit 4-B on August 18, 2009, Parks called him as a witness at the DHO hearing. [Complaint, Docket # 2, Page ID#18, ¶ 116]. It is illogical and nonsensical to call someone as a witness knowing that that person was not present at the subject incident and then complain that he should not have testified because he was not present.

Second, at the DHO hearing, Officer Gardner simply testified as to what he knew had happened, *i.e.*, that Parks received an Incident Report for engaging in a sexual act, Incident Report No. 1906500, and that Parks had to speak to psychology. [Ex. 9: Officer Gardner Dec., ¶¶ 8-10, Attachment C, DHO Report 1906500]. Other than the Plaintiff's conclusory allegations,

---

[21] Parks states that he had filed a grievance against Gardner for his excessive use of force on August 9, 2009. [Complaint, Docket No. 2, Page ID#18, ¶ 117].

there is no evidence to support Parks' claim that Officer Gardner committed perjury at the DHO hearing for Incident Report No. 1906500 in order to retaliate against him. Parks' unsupported allegations are insufficient to establish that Officer Gardner was involved in a conspiracy to retaliate against him. Moreover, Officer Gardner had no role in the investigation and/or in the decision-making process for sanctioning Parks for his disciplinary violations as he was simply called as a witness by the Plaintiff.

vii.    **Lt. Hardin**

Parks claims that Lt. Hardin retaliated against him. As grounds for this claim, Parks states that on or about August 18, 2009, while he was being prepped due to his suicidal claims, Lt. Hardin asked him what he wanted because when he makes suicidal claims he usually wants something. [Complaint, Docket # 2, Page ID#15, ¶ 96]. Lt. Hardin's alleged inquiry to Parks, asking him what he wanted because he usually wants something when he makes suicidal claims, is the sum total of Parks' retaliation claim against Lt. Hardin. Parks makes no further claims or allegations in regard to Lt. Hardin.

Parks must describe how each individual defendant acted personally to deprive him of a constitutional right. The statement by Lt. Hardin does not state a constitutional violation. The use of allegedly harassing or degrading language by a prison official, even when unprofessional and deplorable, does not rise to constitutional dimensions. *Censke v. Ekdahl*, 2009 WL 1393320, 7 (W.D.Mich.,2009) citing *Ivey v. Wilson*, 832 F.2d 950, 954-55 (6thCir.1987); *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir.2004)(harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds*, 2003 WL 22097827, 3 (6thCir.2003) (verbal abuse and harassment do not constitute punishment that

would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, 1997 WL 205604, 1 (6thCir.1997)(verbal harassment is insufficient to state a claim); *Murray v. United States Bureau of Prisons*, 1997 WL 34677, 3 (6th Cir.1997)("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, 1996 WL 721798, 2 (6thCir.1996)("Verbal harassment and idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, 1993 WL 11882 (6thCir.1993)("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment.").  See also *Morrison v. Hartman*, 2012 WL 4801029, 6 (W.D.N.Y.,2012)("Allegations of verbal abuse, without more, generally fail to state an actionable claim under the Eighth Amendment.").

Moreover, Lt. Hardin had no role in the investigation and/or in the decision-making process for sanctioning Parks for his disciplinary violations as he was simply called as a witness by Parks to testify at the October 22, 2009, DHO hearing for Incident Report #1906500. The fact that Lt. Hardin testified that he believed that Parks' suicidal claims were made to take attention away from the charge in Incident Report No. 1906500 does not evidence or establish any personal involvement by Lt. Hardin in a conspiracy to retaliate against Parks.  [Ex. 10: Lt. Hardin Dec., ¶¶ 6-10, Attachment B, DHO Report 1906500].  Parks' unsupported, conclusory allegation against Lt. Hardin contains no evidence of any personal involvement in the alleged deprivation of his constitutional rights.

**viii.    DHO Raitt**

Parks alleges that DHO Raitt was personally involved in a conspiracy to retaliate against him because during the October 22, 2009 DHO hearing, Raitt believed the testimony of PA West, did not believe his own claim that "his unit team is out to retaliate against him because of his desire to seek redress,..." and found him guilty of Incident Report No. 1906500. [Complaint, Docket # 2, Page ID#14, 16, 19, ¶¶ 82, 86, 106-107, 122, 126]. Parks' allegations are unsupported and based on unsubstantiated assumptions and conclusions.

On October 22, 2009, DHO Raitt held a DHO hearing for Incident Report No. 1906500. [Ex. 11: DHO Raitt Dec., ¶ 7, Attachment B, DHO Report No. 1906500]. The record indicates that DHO Riatt observed each of Parks' due process requirements. First, Parks received ample advance notice of the charges against him. *Id.*, ¶ 9. Second, Parks was offered the opportunity to have a staff representative, which he had available at the hearing. *Id.* Third, Parks had an opportunity to make a statement, to present documentary evidence, and to call witnesses to testify on his behalf during the DHO hearing. *Id.* Fourth, Parks was present throughout the hearing. *Id.* Fifth, DHO Raitt prepared a record of the proceedings that documented the advisement of Parks' rights, the DHO findings, the DHO decision, the specific evidence relied upon by the DHO, and a brief statement of the reasons for the imposition of sanctions. *Id.*

Furthermore, a written copy of the decision and disposition was provided to Parks. *Id.* DHO Raitt simply fulfilled his duties as the DHO for USP-McCreary while protecting Parks' due process rights throughout the disciplinary process. *Id.* Moreover, DHO Raitt found that the greater weight of the evidence supported the fact that Parks had committed the prohibited act of engaging in a sexual act. [*Id.* at ¶¶ 7-9; Attachment B, DHO Report No. 1906500]; see *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 454 (1985)(The

Supreme Court has held that procedural due process is not satisfied unless the findings of the DHO are supported by *some evidence* in the record); *Cosgrove v. Rios*, 2008 WL 4706638, 4 (E.D.Ky. 2008)(Court found that DHO review of reports and memoranda constituted "some evidence" and was enough to support the DHO's conclusion and decision to revoke inmate's GTC, impose disciplinary segregation, and loss of privileges).

In the underlying case, there was more than sufficient evidence noted by DHO Raitt in order to support his determination of guilt. Thus, Parks cannot establish through unsubstantiated and conclusory statements that DHO Raitt was personally involved in a conspiracy to retaliate against him merely because he held a DHO hearing for Incident Report No. 1906500 and found Parks guilty of engaging in a sexual act in front of Officer Bryant on August 18, 2009.

ix. **Officer Jones**

Although Parks claims that Officer Jones retaliated against him, he provides no factual support for that allegation. Parks' disruptive actions and his failure to obey a direct order on May 23, 2009, created the need for Officer Jones to take action in order to restore order and discipline. Parks alleges retaliation because Officer Jones confronted him for being late to his two-hour check in. [Complaint, Docket # 2, Page ID#7-9, ¶¶24-49]. Parks was assigned to a Special Accountability Program (SAP) which required him to check in every two hours. [Ex. 12: Officer Jones Dec. ¶¶ 6, 10]. By his own admission, on May 23, 2009, Parks was 24 minutes late for his check-in, and Officer Jones notified him that he would be written-up for his disregard of the SAP program requirements. [Complaint, Docket # 2, Page ID#7, ¶ 24]. Parks escalated the situation by aggressively confronting and challenging Officer Jones for enforcing the SAP

Program requirements which led to his transfer to a higher security unit, Unit 6-B. [*Id.*, Page ID# 7-9, ¶ 24-49; Ex.12: Officer Jones Dec. ¶¶ 6, 10].

Parks asserts, with no supporting evidence, that Officer Jones' actions were in retaliation due to Parks' desire to file grievances and complaints. [Complaint, Docket # 2, Page ID#7, ¶ 29]. In addition, Parks speculates, in the absence of any supporting evidence, that Officer Jones also told a Lieutenant that Parks had a problem with Case Manager Anderson in order to retaliate against him. [*Id.* at Page ID#9, ¶ 48]. Parks has provided no evidence to support his speculative and conclusory allegation that the actions of Officer Jones were undertaken as "reprisal and/or [conspiracy] to retaliate and/or campaigne [sic] of harassment." [*Id.* at Page ID#7, 9, ¶¶ 29, 48]. Parks can only establish that on May 23, 2009, Officer Jones had to take action to stop his own confrontational and disruptive behavior, and Parks provides no supporting evidence for his speculative allegation that Officer Jones' actions were taken as part of a conspiracy to retaliate against him. [Ex. 12, Officer Jones Dec. ¶11].

**x.      AW Messer**

Plaintiff's only claims against AW Messer concern Park's unexhausted Administrative Remedy No. 560801. Consequently, because these claims are unexhausted, they are subject to dismissal and will not be addressed herein on the merits. [Exhibit 1, Declaration of Carlos J. Martinez, ¶ 9, Attachment L, Administrative Remedy Generalized Retrieval Data - Administrative Remedy No. 560801 - R. 54-1].

**xi.      Case Manager Rebecca Woods**

Parks raises no specific allegations against Case Manager R. Woods in his Complaint. While the Plaintiff mentions her as a Defendant, he simply names her only once in the body of

the Complaint.  Parks states:  "About 06-09-09, petitioner received a Unit Disciplinary Committee hearing (UDC) by Holly Anderson and defendant Wood[s], ..."  [Complaint, Docket # 2, Page ID#13 at ¶ 77].  Parks does not explain and/or establish how Case Manager R. Woods was allegedly involved in the alleged conspiracy to retaliate against him.  Moreover, Parks provides no evidence or factual support for his claim that Case Manager R. Woods was a member of a conspiracy to retaliate against him.

Parks appears to base his retaliation claim against Case Manager R. Woods solely on the fact that she was a member of the UDC and presided over one of his disciplinary actions.  Parks cannot establish through unsubstantiated assumptions and conclusions that Case Manager R. Woods was personally involved in a conspiracy to retaliate against him because she fulfilled her duties as a member of the UDC.  As a Case Manager, R. Woods is part of the UDC, and a part of her duties is to subject inmates under her supervision to disciplinary actions.  [Ex. 6: R. Woods Dec. ¶¶6-12, Attachment C, Program Statement 5270.08, Inmate Discipline & Special Housing Unit; Attachment D, Incident Report No. 1892145; Attachment E, Incident Report No. 1892388; Attachment F, Incident Report No. 1903299].

Parks simply makes the unsupported, conclusory allegation that because Case Manager R. Woods presided at some of his UDC hearings, she was retaliating against him and/or was part of a conspiracy to retaliate against him.  Such claim is has no merit and will be dismissed.

### xii.    Unit Manager B. Moulton[22]

---

[22]The allegations against Moulton are apparently dated roughly June 24, 2009. [See R 2: Complaint at ¶¶ 81-84].   No Administrative Remedy addressed the allegation against Moulton dated June 24, 2009 and the one Administrative Remedy which mentions Moulton, Administrative Remedy No. 556951, was unexhausted.  Regardless of his failure to exhaust, and out of an abundance of caution, the Court has reviewed Parks' claim that Moulton retaliated against him.

Parks raises no specific allegations in his Complaint to support his claim that Unit Manager B. Moulton retaliated against him. Parks simply states that on an unspecified occasion, Mr. Moulton told him that he was "being put in for the SMU[23]." Without providing any supporting facts and/or context as to why the alleged statement was made, Parks appears to conclude that Unit Manager B. Moulton was threatening, intimidating, and harassing him for filing grievances. [Complaint, Docket # 2, Page ID#14, ¶¶ 83-84]. As previously stated, the use of allegedly harassing or degrading language by a prison official, even when unprofessional and deplorable, does not rise to constitutional dimensions. See *Censke v. Ekdahl*, 2009 WL 1393320, * 7 (W.D.Mich.,2009) citing *Ivey v. Wilson*, 832 F.2d at 954-55 (6th Cir. 1987).

Moreover, Parks does not explain and/or establish how Unit Manager B. Moulton was involved in the alleged conspiracy to retaliate against him. Even though Parks would have been a candidate for SMU referral while he was housed at USP-McCreary, Unit Manager Moulton did not request a SMU referral for the Plaintiff. [Ex. 14: Moulton Dec. ¶8, Attachment B: Inmate Disciplinary History]. Parks was referred to the SMU by USP-Victorville, not Unit Manager Moulton or any of the staff at USP-McCreary. [Ex. 14: Moulton Dec. ¶8, Attachment D, SMU Referral Packet]. Parks provides no evidence or factual support whatsoever for his allegation that Unit Manager B. Moulton conspired to retaliate against him by referring him to the SMU. Parks simply appears to base his allegation on the fact that Unit Manager B. Moulton was a member of his Unit team and warned him that his continued disruptive behavior could warrant a referral to a SMU unit. [Ex. 14: Moulton Dec. ¶8]. Parks cannot establish through

---

[23] Special Management Unit (SMU). The Bureau of Prisons designates inmates to SMUs where greater management of inmate interaction is necessary to ensure the safety, security, or orderly operation of BOP facilities, or protection of the public. [Ex. 14: Moulton Dec. ¶7, Attachment C: Program Statement 5217.01, Special Management Units].

unsubstantiated assumptions and conclusions that Unit Manager B. Moulton was personally involved in a conspiracy to retaliate against him.

*Bivens* requires a showing that the named defendants performed the acts that resulted in the alleged deprivation of a constitutional right. *Rizzo v. Goode* 423 U.S. at 373-76. Here, the foregoing Defendants did not perform any acts in furtherance of a conspiracy that resulted in the alleged deprivation of a constitutional right, nor were they decision-makers in furtherance of a conspiracy in the undertaking of the alleged adverse action. Thus, their lack of participation and/or lack of knowledge cannot constitute evidence of a conspiracy of retaliation. Accordingly, the Defendants' motion to dismiss will be granted. Alternatively, the Defendants are entitled to summary judgment.

## C.    FAILURE TO ESTABLISH A CLAIM UNDER THE EIGHTH AMENDMENT FOR EXCESSIVE USE OF FORCE

An inmate's post-conviction excessive use of force claim must be raised "exclusively under the Eighth Amendment's cruel and unusual punishment clause." *Pelfrey v Chambers*, 43 F.3d 1034, 1036-37 (6th Cir. 1995). The Eighth Amendment's prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition *de minimis* use of force, provided that the [alleged] use of force is not of a sort repugnant to the conscience of mankind." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir.2000) citing *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).

Although serious or permanent injury is not required to establish an Eighth Amendment claim, some actual injury must be shown. *Id*. In determining whether actual injury has been shown, a court considers the extent of pain inflicted. *Smith v. City of Chattanooga*, 2009 WL

3762961, 8-9 (E.D.Tenn.2009)(Plaintiff is required to prove that excessive force was used and proximately caused the plaintiff to suffer a significant injury. The injury must be more than *de minimis* for the plaintiff to meet his burden.).  See also *Hutson v. Felder*, 2008 WL 4186893, 4 (E.D.Ky.2008)("With respect to any kind of excessive force claim under the Fourth Amendment, to state a constitutional claim an arrestee must allege that the officer used more than *de minimis* force, that the force used was excessive, and that he or she suffered some objectively verifiable injury and/or actively sought medical attention thereafter."); *Siglar v. Hightower*, 112 F3d 191, 193-94 (5th Cir.1997)(held that a sore, bruised ear lasting for three days that resulted from an officer twisting the inmate's ear was *de minimis* and insufficient to provide a basis for a meritorious civil rights lawsuit.).

In *Hudson v. McMillian*, *supra*, the Supreme Court set forth the standard for analyzing excessive force claims under the Eighth Amendment: "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7, 112 S.Ct. 995; *accord Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  Thus, the inquiry in all cases where prisoners allege the excessive use of force is whether the force was applied "maliciously and sadistically for the very purpose of causing harm."  *Haynes v. Marshall*, 887 F.2d 700, 703 (6th Cir.1989).  The unnecessary and wanton infliction of pain upon an inmate violates the Eighth Amendment.  *Id.* See *Pelfrey*, 43 F.3d at 1037 ("a violation of the Eighth Amendment will nevertheless occur if the offending conduct reflects an unnecessary and wanton infliction of pain.").

In determining whether the use of force was wanton and unnecessary, the court balances several factors.  The factors to consider are: 1) the extent of injury suffered by an inmate; 2) the

need for application of force; 3) the amount of force used; 4) the relationship between the need for force and the amount used; 5) the threat as reasonably perceived by the officer; 6) and any efforts made to temper the severity of a forceful response. *Hudson* 503 U.S. at 7. Thus, the absence of serious injury is not irrelevant to the inquiry regarding whether the force used against a prisoner was excessive, in violation of the Eighth Amendment prohibition of cruel and unusual punishment, because the extent of injury suffered is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, and the extent of injury may also provide some indication of the actual amount of force applied, if any. *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010). See also *Ramos v. Samaniego*, 2008 WL 3539252, 2 (W.D.Tex. 2008)(Plaintiff asserted that Correctional Officer used excessive force against him during a shakedown, by twisting his wrists, while handcuffed, and slamming his head against a door, causing a swollen bump on his forehead, a headache, and dizziness. Court found that the injuries alleged by plaintiff appeared to be no more than *de minimis*, and therefore insufficient to state a constitutional violation.).

It is necessary to look at the injury suffered by the plaintiff in order to assess whether the amount of force allegedly used was indeed excessive. While a showing of extreme injury is not required to bring an excessive force claim against prison officials, *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind, are not actionable as a violation of the Eighth Amendment. *Atkins v. County of Orange*, 372 F.Supp.2d 377, 398 (S.D.N.Y. 2005), *aff'd sub nom.*, *Bellotto v. County of Orange*, 248 F. App'x 232 (2d Cir. 2007). See also *Wilkins v. Gaddy*, *supra* (The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis*

uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.).

In the instant case, Parks has failed to establish that he suffered more than *de minimis* injury, if any. *Hutson v. Felder*, 2008 WL 4186893, 8 (E.D.Ky.2008) (Temporary and minor discomfort is insufficient to establish a claim of a constitutional magnitude.). See *Hill v. O'Brien*, 2011 WL 1238038, 6 (W.D.Va.2011) ("Ambulatory restraints are designed and applied to limit a prisoner's movement but not to inflict any measure of physical harm on him.") citing *Holley v. Johnson*, 2010 WL 2640328, 14 (W.D.Va.2010).

Parks' allegations fail to support a Constitutional claim of excessive use of force. Parks raises only one possible allegation of use of excessive force; however, this possible allegation when reviewed amounts, at best, to *de minimis* force. In his Complaint, Parks states that on May 23, 2009, he was ordered to put his hands on the wall after entering into a confrontation with Officer Jones and failing to follow a direct order.[24] Parks does not actually allege excessive force was used against him. [Complaint, Docket # 2, Page ID#7-9, ¶¶ 24-49]. At the outset, any possible claim of excessive use of force was not administratively exhausted as Parks failed to raise an excessive force claim in his administrative remedies. [Exhibit 1, Declaration of Carlos J. Martinez, at Attachment P - R. 54-1]. Instead, Parks merely describes the incident generally in his BP-8. *Id*. The BP-9, BP-10, and BP-11 Responses make no reference to an excessive force claim. Thus, any claim of excessive force is barred for failure to exhaust administrative remedies.

_____

[24] Parks' only possible administratively exhausted allegation of use of excessive force is this one, dated May 23, 2009; however, it appears that this possible claim of excessive force was not administratively exhausted. Further, it is also time-barred.

Parks submits that he told the staff member that he has a "messed-up rotative [sic] cuff and torn ligament" and could not put his right hand up and high. [Complaint at ¶ 41]. Other than communicating the incident and vaguely claiming retaliation, Parks does not make any factual allegation that he suffered any physical injury due to the alleged incident. The medical records show no entry for a right shoulder injury on May 23, 2009, and Parks did not complain of right shoulder pain until August 9, 2009, almost three months later, when an injury assessment was conducted due to a complaint of pain to the right shoulder area and difficulty moving his right arm.[25] 42. [Ex. 15: Dr. Velazquez Dec., ¶ 3, Attachment B, Medical Records]. Even when Parks is given the benefit of the doubt, the minor amount of force actually used on him by Officer Jones was commensurate with the need to conduct a pat search on a disruptive inmate. Here, the minimal force Parks claims that Officer Jones used to secure his compliance with the pat down was not "significantly disproportional to" the need to conduct the search. The use of force (to the extent this can even be called the use of "force") allegedly used by Officer Jones was consistent with a good faith attempt to maintain prison discipline and order. [Ex. 12: Officer Jones Dec., 10, 11].

Because the prison environment is a very dangerous one for correctional officers, courts must accord prison administrators "wide-ranging deference" to design and implement policies and restraint measures that they believe are necessary for the preservation of order and security, based on their professional judgment and experience. *Whitley v. Albers*, 475 U.S. 312, 321-22

---

[25] On the August 9, 2009, injury assessment, Parks did not state what caused his injury, and the medical examination revealed no visible injury as Parks had a full range of motion. [Ex. 15: Dr. Velazquez Dec., ¶3, Attachment B, Medical Records]. Moreover, the August 9, 2009, medical assessment occurred after a second incident in which Parks had to be detained and pat searched after being aggressive and insolent towards medical staff. Officer Jones was not involved in the August 9, 2009 pat search. [Ex. 15: Dr. Velazquez Dec. ¶3, Attachment B: Medical Records May 2009- November 2009; Ex. 9: Gardner Dec., 11- 61.

(1986).  See also *Kalwasinski v. Artuz*, 2003 WL 22973420, 6-7 (S.D.N.Y. 2003) (Prison official

did not act maliciously, as required for excessive use of force claim under Eighth Amendment,

when he allegedly pressed prisoner's face into wall, to attempt to secure compliance of prisoner,

who was arguing with him about manner in which he was conducting pat down; amount of force

used was not significantly disproportional to need to conduct search, rather it was consistent with

good faith attempt to maintain prison discipline and order.); *Vogelfang v. Capra*, 2012 WL

832440, 10 (S.D.N.Y. 2012)( Being pushed against a wall and pat-searched alleges only a degree

of roughness that is common in prison contexts where plaintiff did not claim a lasting or even

fleeting injury resulting from the defendant's conduct, such conduct is insufficiently serious to

support an Eighth Amendment claim.); *Spencer v. Moore*, 2012 WL 2847497, 5

(S.D.Ohio.2012), overruling report and recommendation on other grounds, 2012 WL 4364085,

6 (S.D. Ohio 2012) (Correctional Officer's alleged "shove" or hand on Plaintiffs back, as well as

any contact that her foot made with Plaintiff's feet at the initial stop for purpose of conducting a

pat-down search, constitutes the same type of minimal and reasonable contact relating to

bringing an unruly inmate under control).

    In *Hamer v. Jones*, 364 F. App'x 119, 121, 124 (5th Cir.2010) an inmate caused a

disturbance after which an officer slammed him against the wall while holding him by the throat,

then forced him to the floor.  The Fifth Circuit found that while the inmate's injuries were

"arguably more than de minimis," they did not demonstrate injuries that were the product of the

sort of unnecessary force described by *Hudson*, 503 U.S. at 9-10.  The inmate did not dispute

that he created a disturbance, and the force used against him was in response to that disturbance

and was employed for the purpose of maintaining discipline and not with a goal of subjecting

him to harm; therefore, there was no cognizable Eighth Amendment injury.  *Hamer*, 364 F. App'x at 124.

Parks' own disruptive actions and his failure to obey a direct order on May 23, 2009, created the need for Officer Jones to take some action in order to restore order and discipline. [Ex. 12: Officer Jones Dec., ¶ 10].  The minimal force used in having Parks face the wall, raise his hands, and be patted down, did not cause any serious or significant physical injury, if any. *Hudson v. McMillian*, 503 U.S. at 9 ( "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (internal quotes omitted).  In this case, not only did Parks fail to prove any significant injury, or even a *de minimis* injury, he also failed to show that the nature of the force imposed upon him amounted to a use of force "repugnant to the conscience of mankind."  Therefore, Parks fails to establish the elements of an Eighth Amendment claim.  The Defendants' motion to dismiss will be granted.  Alternatively, the Defendants are entitled to summary judgment.

## D.    FAILURE TO ESTABLISH A CLAIM PURSUANT TO 42 U.S.C. § 1997e(e).

The PLRA was enacted in 1996 and made significant changes in prisoner litigation. Congress enacted the PLRA, 110 Stat. 1321-71, as amended 42 U.S.C. § 1997e, *et seq.*, in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts.  See *Jones v. Bock*, 549 U.S. 199, 203-04 (2007); *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  The PLRA contains a variety of provisions designed to bring prisoner litigation under control, such as:  requiring prisoners to exhaust prison administrative grievance procedures before filing suit (§1997e(a)); requiring district courts to weed out prisoner claims that clearly lack merit (§1997e(c)); prohibiting claims for emotional injury without a prio

showing of physical injury (§ 1997e(e)); and restricting attorney's fees (§1997e(d)).The pertinent

provision of the PLRA at issue is codified in 42 U.S.C. § 1997e(e) which states, as follows:

42 U.S.C. § 1997e(e):

**(e) Limitation on Recovery**

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Thus, under 42 U.S.C. § 1997e(e), the PLRA statutorily mandates a prior showing of physical injury before a prisoner may bring a claim for emotional or mental damages. See *Lyvers v. Sullivan*, 2008 WL 4224289, 3 (E.D.Ky.2008)(Regarding case law concerning Fourth, Eighth, and Fourteenth Amendment claims, the courts have routinely held that 1997e(e) operates to prohibit those lawsuits when no physical injury is shown).

While § 1997e(e) does not define "physical injury," the case law in this area reflects that the predicate injury need not be significant, but must be more than *de minimis* to satisfy the provision of the PLRA. See *Randall v. Pitzer*, 2001 WL 1631467 (6th Cir.2001)(Plaintiff cannot rely on his alleged mental anguish and suffering to support his claim.); *Cassidy v. Indiana Dep't of Corr.*, 199 F.3d 374, 376 (7th Cir.2000); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir.1997) (physical injury required as predicate for emotional distress claim must be more than *de minimis*). A physical injury has been defined as "an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc..., Injuries treatable at home and with over-the-counter drugs, heating pads, rest, etc., do not fall within the parameters of 1997e(e)." *Loung v. Hatt*, 979 F.Supp. 481, 486 (N.D.Tex.1997); *Weathington v. BOP*, 2010 WL 545294, 2 (W.D.La.2010); *Beard v. Green*, 2010 WL 411084, 5 (S.D. Fla.2010). See also *Wilkins*, 130 S.Ct. at 1178 (The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.).

In *Janiett v. Wilson*, 162 F. App'x 394, 400 (6th Cir.2005), the Sixth Circuit determined that the language of § 1997e(e) applies to Eighth Amendment claims brought under 42 U.S.C. § 1983, thereby prohibiting claims for *de minimis* physical injuries. In addition, most Courts have held § 1997e(e) applies to all types of federal prisoner lawsuits. See *Glover-Bryant v. Uptagraft*, 2009 WL 2877149, 6 (E.D.KY.2009)(Lawsuit by federal inmate who had been allegedly improperly searched in a public area precluded by § 1997e(e), absent a showing of physical injury. The Court concluded that the compensation sought in the lawsuit for trauma and emotional damages is barred by federal law.)[26] See also *Taylor v. United States of America, et al.,* 161 F. App'x 483, 485-87 (6th Cir.2005); *Thompson v. Carter*, 284 F.3d 411, 416-18 (2d Cir. 2002); *Searles v. Van Bebber*, 251 F.3d 869, 876 (10th Cir.2001); *Allah v. Al Hafeez*, 226 F.3d 247, 250-51 (3d Cir.2000); *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004); *Davis v. District of Columbia*, 158 F.3d 1342, 1348-49 (D.C. Cir.1998).

The Sixth Circuit has clearly upheld the principles of the PLRA's statutory mandate that no Federal civil action may be brought by an inmate, without a prior showing of physical injury, for allegations of excessive use of force in a correctional setting. Thus, in order to raise an Eighth Amendment excessive use of force claim, which falls under the category of cruel and unusual punishment, a plaintiff must have suffered an injury as a prisoner. See *Williams v. Bulthus,* 182 F.3d 920, at 920 (6th Cir.1999)("[M]ere allegations of verbal abuse and harassment by prison officials towards an inmate do not constitute punishment within meaning of the Eighth

---

[26] The Court in *Glover-Bryant* also cited Title 28 U.S.C. § 1346(b)(2) as reinforcing the Court's conclusion that Congress has limited recovery for the plaintiff's emotional injuries. Section 1346(b)(2) states in pertinent part:

> No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Amendment.").  An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim under the Eighth Amendment. *Wilkins v. Gaddy*, *supra*.

In the present case, Parks' only potentially exhausted allegation of use of excessive force is dated May 23, 2009, which appears to be both unexhausted and time-barred.  Parks provides no evidence in his Complaint or otherwise to demonstrate that he suffered an injury and/or that his alleged injury was more than *de minimis* physical harm or injury from the alleged wrongdoing.  In his Complaint, Parks makes no allegations of having sustained any serious injuries from being patted down on May 23, 2009 by Officer Jones.  [Complaint, Docket # 2, Page ID#7-9, ¶¶ 24-49].  Additionally, Parks has provided no evidence of any complaints for injuries, pain, complications, or incapacity due to the alleged physical injury.  Moreover, his BOP medical records do not support his allegation that excessive force was used as they contain no reference to any shoulder injury on or around May 23, 2009.  [Ex. 15: Dr. Velazquez Dec., ¶ 3, Attachment B, Medical Records].  The physical injury requirement of the PLRA provision has been described as *de minimis* when the kind of injury sustained by the inmate would not require a free-world person to visit an emergency room, or have a doctor attend to or give an opinion, diagnosis, and/or medical treatment for the injury.  *Skandha v. Savoie*, 811 F.Supp.2d 535, 539 (D. Mass.2011).

Accordingly, Parks fails to state a valid claim as he fails to allege any injury, or a more than *de minimis* physical harm, arising from the alleged wrongdoing in this action.  See *Williams v. Smith*, 2006 WL 938980, 2 (W.D.Ky.2006)(Plaintiff failed to demonstrate that he had suffered physical damage greater than *de minimis* injury.  Plaintiff did not demonstrate that he suffered physical injuries or long lasting physical side effects from the alleged incident.).  Thus, because

Parks did not suffer a substantial physical (or any) injury, the Complaint must be dismissed in its entirety pursuant to 42 U.S.C. § 1997e(e) of the PLRA, Title 28 U.S.C. § 1346(b)(2), and for failure to allege a claim upon which relief can be granted pursuant to Fed.R.Civ.P.12(b)(6). Alternatively, the Defendants are entitled to summary judgment.

## E.     THE COMPLAINT FAILS TO STATE A CONSPIRACY CLAIM

When a prisoner initiates a civil action seeking redress from a governmental agency, officer or employee, the trial court must review the complaint and dismiss the complaint, or any portion of the complaint, if the court determines that it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  See 28 U.S.C. 1915A(b)(1),(2).

In order to survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. at 678, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*., citing *Twombly*, 550 U.S. at 556. "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir.2009) citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir.2009).  "But the district court need not accept a 'bare assertion of legal conclusions.'"  *Tackett*, 561 F.3d at 488, quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556

U.S. at 678, quoting *Twombly*, 550 U.S. at 555,557. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Elements of civil conspiracy are (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *Johnson v. U.S.*, 590 F.Supp.2d 101, 107 (D.D.C. 2008). The standard for proving a § 1983 conspiracy claim was set forth in *Hooks v. Hooks*, 771 F.2d 935 (6th Cir.1985). A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. What must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Hooks*, 771 F.2d at 943-44.

The foundation of Parks' allegation is that the Defendants were involved in a conspiracy to retaliate against him for filing grievances against prison staff. Parks appears to assert that all of the Defendants purposely and systematically filed or caused others to file Incident Reports against him in order to cause him to be sanctioned at the UDC and DHO hearings and/or be housed in a higher security unit. According to Parks, this was done to retaliate against him for having filed grievances against some of the Defendants and other USP-McCreary staff members. Thus, Parks attempts to impute liability to all the Defendants by arguing that the Defendants entered into a campaign of filing Incident Reports against him in an attempt to harass and retaliate against him. Other than unsupported, conclusory, bare-boned assumptions of a

conspiracy, Parks has not established that there was an agreement and/or a conspiracy among the named Defendants. In his Complaint, Parks provides bits and pieces of several separate and unrelated disciplinary actions and events, and he vaguely attempts to link them together in order to argue for a conspiracy. However, Parks provides no factual support or evidence that the named Defendants were involved in a conspiracy or agreement with one another to issue Incident Reports and/or sanction him. "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir.1987). See also *Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir.2004); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir.2003). Conclusory allegations of an agreement will not suffice to prove civil conspiracy. *Johnson*, 590 F.Supp. at 107. See *Brady v. Livingood*, 360 F.Supp.2d 94, 104 (D.D.C.2004) (mere allegation that defendants "agreed among themselves" to subject plaintiff to discriminatory acts, without alleging facts suggesting that the defendants were acting in concert in furtherance of a shared goal of discriminating against him not sufficient).

In the case at hand, Parks' conspiracy claim against the named Defendants is without merit and must be dismissed. In short, Parks has not set forth any facts to suggest that there was a conspiracy among the Defendants and events that separately transpired from May 2009 to October 2009. Furthermore, only portions of the May 22, 2009 and May 23, 2009 incidents appear to be properly exhausted, and even they are barred by the statute of limitations.

Apparently, Parks attempts to establish a conspiracy through the fact that the Defendants all worked at USP-McCreary; some were members of his Unit Team and interacted with him at different times in relation to his disciplinary issues. However, the mere fact that the Defendants interacted with Parks at different times while fulfilling their duties at USP-McCreary, due to his

disciplinary problems, is no evidence whatsoever of an agreement to harass or retaliate against Parks among any of the Defendants.  The only reason these staff members interacted with the Plaintiff, and thereby casually with one another, was due to his constant disruptive behavior and indecent actions which forced the named staff members to interact with him by taking disciplinary actions.  There is simply no evidence that at any time, the named Defendants agreed to or entered into a conspiracy to retaliate and/or harass Parks. [Ex.2: PA West Dec., ¶ 10]; [Ex 3: Case Manager Anderson Dec., ¶ 12]; [Ex. 4: Counselor Wood Dec., ¶ 9]; [Ex. 5: Dr. Willard Dec., ¶ 9]; [Ex. 6: Case Manager Woods Dec., ¶ 121; [Ex. 7: Officer Bryant Dec., ¶ 7]; [Ex. 8: Counselor Straub Dec., ¶ 8]; [Ex. 9: Officer Gardner Dec., ¶ 10]; [Ex. 10: Lt. Hardin Dec. ¶ 10]; [Ex. 11: DHO Raitt Dec. ¶ 9]; [Ex. 12: Officer Jones Dec., ¶ 11]; [Ex. 13: Associate Warden Messer Dec., ¶ 11; [Ex. 14: Unit Manager Moulton Dec., ¶ 9].

A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory" and/or when it describes "fantastic or delusional scenarios."  *Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989).  Parks' claim of conspiracy is broad, conclusory, and lacks the degree of specificity required to establish a conspiracy claim.  Parks has not established that there was a single plan and/or agreement to retaliate against him or harass him.  Moreover, Parks cannot establish that the Defendants agreed or shared in a general conspiratorial objective with one another.  See *Adams v. Hargrove*, 2010 WL 2651290, 2 (W.D.Ky.2010), citing *Hooks v. Hooks*, *supra*.  Parks merely states legal assumptions and conclusions couched as factual allegations and the formulaic recitation of the elements for his alleged cause of action.  While *pro se* litigants are held to a less stringent pleading standard than an attorney, the court is not required to "accept as true legal conclusions or unwarranted factual inferences."  See *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).

Parks simply fails to meet the requisite degree of specificity needed to sustain a *Bivens* conspiracy. Parks makes a number of allegations in his Complaint but presents no evidence from which it can even be inferred that the Defendants acted in concert. Parks presents a buckshot pattern of facts concerning a period of several months with no evidence, circumstantial or otherwise, suggesting that the Defendants had a single unlawful plan, purpose, or agreement. Moreover, the Plaintiff has failed to establish that he was injured by any of the alleged unlawful actions. There have been no constitutional deprivations by the named Defendants or any unlawful actions by them. Without an unlawful action causing an injury, Parks cannot establish a claim for a conspiracy to retaliate. Thus, the *Bivens* conspiracy claim against the Defendants must be dismissed for failure to state a conspiracy claim. Alternatively, the Defendants are entitled to summary judgment.

**F.      THE COMPLAINT FAILS TO STATE A FIFTH AND FOURTEENTH AMENDMENT CLAIM.**

Any Fifth and Fourteenth Amendment claims are barred by Parks' failure to exhaust administrative remedies and the statute of limitations. Out of an abundance of caution, the Court will address the one DHO hearing involving Incident Report No. 1906500 (see Ex. 11: Raitt Dec. at Attachment B) about which Parks seems most concerned, to explain, in the alternative, why the Defendants are entitled to a dismissal of that claim and/or summary judgment.

**1.      BOP's Disciplinary Process and Due Process Rights.**

Pursuant to 18 U.S.C. 4042(a)(3), the BOP administers an inmate disciplinary process to promote the safe and orderly running of their correctional institutions. Upon arriving at a BOP facility, all inmates receive written notice of their rights and responsibilities, prohibited acts within the institution, and the specifics of the disciplinary system. The violation of a prohibited

act carries sanctions corresponding to the severity of the offense. Sanctions range from severe, disciplinary segregation, loss of good time credits (GTC), loss of privileges, to verbal warnings. See 28 C.F.R. 541.13, Prohibited acts and disciplinary severity scale.

The BOP disciplinary process is fully outlined in the Code of Federal Regulations, Title 28, Sections 541.10 through 541.23.[27] These regulations dictate the manner in which disciplinary action may be taken when a prisoner violates or attempts to violate institutional rules. The first step in the disciplinary process requires the filing of an Incident Report and an official investigation pursuant to 28 C.F.R. 541.14. Following the investigation, the matter is then referred to the UDC for a hearing pursuant to 28 C.F.R. 541.15. If the UDC finds that the inmate has committed a prohibited act, it may impose minor sanctions. If the alleged violation is serious, or involves a prohibited act listed in the greatest severity category, the UDC must refer the matter to the DHO for a hearing. 28 C.F.R. 541.15(h).

In *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), the United States Supreme Court recognized that prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due to a defendant in such proceedings do not apply. However, the Court recognized that the Due Process Clause provides certain minimum protections for inmates facing the loss of good time credits (GTC) as a disciplinary sanction. *Id*. at 556-58. The Court then held that when a prison disciplinary hearing may result in the loss of good conduct time credits, due process requires that the inmate receive: 1) written notice of the charges at least 24 hours in advance of the disciplinary hearing; 2) a written statement by the fact finder as to evidence relied on and reasons for the disciplinary action; 3) an opportunity to call witnesses and present

---

[27] 28 CFR Part 541 was amended in December 2010, with an effective date of March 1, 2011. See 75 FR 76263, 2010 WL 4956298 and 75 FR 81853, 2010 WL 5343123. This Memorandum Opinion and Order cites the previous version because the relevant events and DHO hearings occurred prior to the date the changes were effective.

documentary evidence in his defense when doing so would not be unduly hazardous to institutional safety or correctional goals; and 4) the assistance of staff or a competent inmate when the inmate is illiterate or when the issues are complex. *Wolff,* 418 U.S. at 556, 564-570. See also *Hatch v. Wilson*, 2009 WL 2877222, 5 (E.D.Ky. 2009) citing *Allen v. Reese*, 52 F. App'x. 7,8 (8th Cir.2002)(holding that federal prisoner's right to due process was satisfied, as he was given (i) written notice of the charges against him, (ii) the right to call witnesses, and (iii) a written report of the DHO's decision). Consistent with the minimum procedural protections required by *Wolff*, the BOP disciplinary procedures, as set forth in 28 C.F.R. 541.17, require the following: (1) 24-hour advance written notice of the charge before the inmate's initial appearance before the DHO; this right may be waived, 541.17(a); (2) an inmate will be provided a staff representative at the DHO hearing, if so desired, 541.17(b); (3) an inmate is entitled to make a statement and to present documentary evidence at the DHO hearing; the inmate may also call witnesses to testify on his behalf, 541.17(c); (4) the inmate is entitled to be present throughout the hearing, 541.17(d); (5) the DHO prepares a record of the proceedings that documents the advisement of the inmate's rights, the DHO findings, the DHO decision, the specific evidence relied upon by the DHO, and a brief statement of the reasons for the imposition of sanctions, 541.17(g); (6) a written copy of the DHO's decision and disposition is ordinarily provided to the inmate within 10 days of the DHO's decision, 541.17(g). The BOP disciplinary procedures meet or exceed the due process requirement for prison disciplinary proceedings as prescribed by the Supreme Court in *Wolff*.

**2.      "Some evidence" evidentiary standard**

BOP Program Statement 5270.08, Inmate Discipline & Special Housing Units, states in pertinent part:

f.  The DHO shall consider all evidence presented at the hearing.  The decision of the DHO shall be based on at *least some facts*, and if there is conflicting evidence, it must be based *on the greater weight of the evidence*.  The DHO shall find that the inmate either:

(1) Committed the prohibited act charged *and/or a similar prohibited act* if reflected in the Incident Report; or

(2) Did not commit the prohibited act charged or a similar prohibited act if reflected in the Incident Report.  (Emphasis added).

[Ex. 3: Anderson Dec. , Attachment C, Program Statement 5270.08, Inmate Discipline & Special Housing Units, Chapter 7].  See also 28 CFR 541.17(f).

As reflected in Program Statement 5270.08, in order to support the loss of good time credits, the decision of the DHO need not comport with the requirement of proof beyond a reasonable doubt as applicable to criminal trials.  In *Superintendent Massachusetts Correctional Institution v. Hill*, *supra*, the Supreme Court set out the constitutional evidentiary standard to be used when courts review prison discipline decisions.  The Court held that the Due Process Clause is satisfied if there is "some evidence" to show that the inmate committed some offense.  *Hill*,472 U.S. at 455.

The Court declined to adopt a more stringent evidentiary standard as a constitutional requirement, stating: "Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances.  The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact."  *Id.* at 456 (internal citations omitted).

The "some evidence" standard is a lenient one, requiring no more than "a modicum of evidence," and is met if there is *any evidence* in the record that could support the [DHO's]

decision. (Emphasis added), *Id*. at 455-56. The "some evidence" standard requires only that the disciplinary decision is not arbitrary and does have evidentiary support. *Hill*, 472 U.S. at 457. See *Hatch v. Wilson, supra* at 4 (The District Court denied a Prisoner Petition for Writ of Habeas Corpus alleging violation of due process rights for failure to call witness on his behalf during disciplinary proceeding. Record revealed "some evidence" supporting the DHO conclusions). See also *Farris v. Wilson*, 2009 WL 3257955, 2, 3 (E.D.Ky.2009) (Incident Report upon which the DHO relied to convict the inmate of a violation of Code 104 constituted "some evidence". The DHO was not required to accept the petitioner's claim that others were responsible for the weapon discovered in his cell. The discovery of the weapon in the cell was sufficient to support the conviction.); *Kuttab v. Jeter*, 2005 WL 1170464 (5th Cir. 2005)("Because the disciplinary decisions were supported by some evidence, [Petitioner] has not shown that the disciplinary sanctions were arbitrary or capricious."); *Quintanilla v. O'Brien*, 127 F. App'x. 887, 888 (7th Cir.2005)(prison guard recovery of seven-inch, hand-sharpened shank under mattress provided "some evidence" sufficient to comport with due process and to support conviction for possessing dangerous contraband).

The Supreme Court noted in *Hill* that ascertaining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or the weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the DHO. *Hill*, 472 U.S. at 455-56. Accordingly, upon review of a disciplinary proceeding, the court should determine only whether the DHO's decision to revoke good time credits has some factual basis, *i.e*., the court should only consider whether there is any evidence that could support the finding. *Id*. See also *Hatch v. Wilson*, *supra* at 5(The threshold requirement of 'some

evidence' is a relatively low one.); *Farris v. Wilson*, supra at 3 ("Thus, 'some evidence' is a

lenient standard."); *Reeves v. Pettcox*, 19 F.3d 1060, 1062 (5th Cir.1994)("[P]rison disciplinary

proceedings will be overturned only where there is no evidence whatsoever to support the

decision of prison officials"). "[T]his court is not free to retry the disciplinary charge and

substitute its opinion for that of the [DHO]." *Novey v. Federal Bureau of Prisons*, 2008 WL

4280342, 2 (E.D. Tex. 2008). See also *Sarmineto v. Hemingway*, 93 F. App'x. 65, 68 (6th

Cir.2004) (Credibility determinations of hearing officers cannot be disturbed on appeal.); *Nunez

v. Sniezek*, 2005 WL 3483782, 3 (N.D. Ohio 2005)("The court is not permitted to re-weigh the

evidence presented to the board.") citing *Hill*, 472 U.S. at 455.

Therefore, the requirements of due process are satisfied if some evidence supports the

decision by the prison disciplinary board to revoke good-time credits. *Hill*, 472 U.S. at 455(It is

not the court's role to "second guess[ ]" the "disciplinary board's factual findings or decisions");

See also *Humphreys v. Hemingway*, 77 F. App'x 788, 789 (6th Cir.2003)(Because the DHO's

decision was supported by "some evidence" in the record, petitioner was not entitled to habeas

relief on his claim); *Bachelder v. Patton*, 2007 WL 108415, 5 (E.D.Ky. 2007)(Petitioner

challenged the sufficiency of the evidence upon which he was convicted in a disciplinary\

hearing. Court found that "the law is clear that a DHO need not accept what the inmate

perceives to be the 'best evidence' or the most convincing or persuasive set of facts: . . . , there

need only be 'some evidence' to support disciplinary decision."); *Laor v. Federal Bureau of

Prisons*, 2009 WL 1410728, 7 (D.N.J. 2009)(The DHO report plainly shows that it was "'not so

devoid of evidence that the findings of the [DHO were] without support or otherwise arbitrary,'"

quoting *Hill*, 472 U.S. at 457); *Sinde v. Gerlinski* 252 F.Supp.2d 144, 150 (M.D. Pa.2003)("If

there is 'some evidence' to support the decision of the hearing examiner [DHO], the court must

reject any evidentiary challenges by the plaintiff").  "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board [DH0]," and a disciplinary finding can be upheld on even "meager" evidence, as long as "the record is not so devoid of evidence that the findings of the disciplinary board [DHO] were without support or otherwise arbitrary." *Hill,* 472 U.S. at 457.

**3.     Parks received due process in all disciplinary proceedings.**

The record reflects that the BOP observed and satisfied each of the Plaintiff's due process rights.

First, Parks received ample advance notice of the charges against him.  The Incident Report was prepared and delivered more than 24 hours before Parks' UDC and DHO hearings. The Incident Report was delivered on the date of the incident, August 18, 2009, at 9:15 a.m., and the UDC hearing was conducted on August 19, 2009 at 12:20 p.m., more than 24 hours after Parks received notice of the Incident Report.  [Ex. 11, DHO Raitt Dec. ¶ 9, Attachment B, Incident Report and Discipline Hearing Officer Report ].  In addition, on August 19, 2009, Parks was provided with a Notice of Discipline Hearing before the DHO form and an Inmate Rights at Discipline Hearing form.  The hearing before the DHO took place on October 22, 2009. [Ex. 11, DIM Raitt Dec. ¶ 9, Attachment B, Discipline Hearing Officer Report and Inmate Rights at Disciplinary Hearing].

Second, Parks was offered the opportunity to have a staff representative.  Parks did not waive his right to a staff representative and requested Dr. Mary Willard as a staff representative. Dr. Willard agreed to serve as a staff representative.  [Ex. 11, DHO Raitt Dec. ¶ 9, Attachment B, Notice of Discipline Hearing before the DUO; Duties of Staff Representative Form; Disciplinary Hearing Officer Report; Ex. 5: Dr. Willard Dec. ¶ 6].

Third, Parks had an opportunity to make a statement, to present documentary evidence, and to call witnesses to testify on his behalf during the DHO hearing. Parks made a statement denying the offense charged in the Incident Report. Parks indicated that he had no documentary evidence to present at the DHO hearing. He called five witnesses: (1) PA West (by prior written statement); (2) Lieutenant Alexander; (3) Lieutenant Hardin; (4) Officer Gardner; and (5) another Inmate. [Ex. 11, DHO Raitt Dec. ¶ 9, Attachment B, Disciplinary Hearing Officer Report; Ex. 2: PA West Dec. ¶¶ 7-8].

Fourth, Parks was allowed to be present throughout the DHO hearing. *Id.*

Fifth, the DHO prepared a record of the proceedings that documented the advisement of the inmate's rights, the DHO findings, the DHO decision, the specific evidence relied upon by the DHO, and a brief statement of the reasons for the imposition of sanctions. [ Ex. 11, DHO Raitt Dec., Attachment B, Disciplinary Hearing Officer Report].

Finally, the DHO made a decision on October 22, 2012, and a written copy of the DHO's decision and disposition was provided to the Plaintiff on October 22, 2012. [Ex. 11, DUO Raitt Dec. ¶ 9, Attachment B, Disciplinary Hearing Officer Report].

Based on the foregoing, there was no denial of the Parks' due process rights. Thus, his allegations of a due process violation fail.

**4.      Sufficiency of the evidence.**

To reiterate, the Supreme Court has held that procedural due process is not satisfied unless the findings of the DHO are supported by "some evidence" in the record. *Hill*, 472 U.S. at 454-55. In the present case, there is more than sufficient evidence noted in the DHO Report to support the determination.

Summarizing that evidence, the DHO report demonstrates that the DHO considered and relied upon enough evidence to support his determination that Parks violated Code 205, Engaging in a Sexual Act. The DHO relied on the following evidence: (1) the written statement of Officer K. Bryant who observed Plaintiff engaging in the prohibited act; (2) the written testimony of PA Ben West who stated that Parks had no medical issues that prevented him from committing the prohibited act; and (3) the testimony of Plaintiff's witnesses, Lieutenant Alexander, Lieutenant Hardin, and Officer Gardner provided nothing to support Parks' claim. [Ex. 11, DUO Raitt Dec. ¶9 , Attachment B, Disciplinary Hearing Officer Report]. Thus, the DHO report demonstrates that there was more than "some evidence", in accordance with the Supreme Court's decision in *Hill* to support the DHO's finding of guilt and sanctions. See *Cosgrove v. Rios*, 2008 WL 4706638, 2, 4, 6 (E.D.Ky. 2008)(Court found that DHO review of reports and memoranda constituted "some evidence" and was enough to support the DHO's conclusion and decision to revoke inmate's GTC, impose disciplinary segregation, and loss of privileges).

Consequently, Parks cannot establish that his due process rights were violated during the disciplinary proceedings at USP-McCreary. Plaintiff's Complaint is subject to dismissal. Alternatively, the Defendants are entitled to summary judgment.

**5.      A disciplinary conviction must be challenged by filing a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.**

Challenges to events related to disciplinary convictions must be brought by way of a Petition for Writ of Habeas Corpus, under 28 U.S.C. § 2241, not by way of a *Bivens* civil rights action. *Coleman v. Lappin*, 2011 WL 4586922 at *11 (E.D. KY 2011); *Jones v. Daniels*, 2010 WL 2228355 at *11 (E.D. KY 2010). Parks cannot bring a *Bivens* action on his disciplinary convictions until the disciplinary convictions being challenged have been reversed. Success in a

*Bivens* action would necessarily imply the invalidity of a disciplinary conviction, which is not

cognizable under a *Bivens* action. *Coleman v. Lappin*, *supra*; *Jones v. Daniels*, *supra*. See also

*Edwards v. Balisok*, 520 U.S. 641, 646-648 (1997)(holding that a claim that "necessarily

impl[ies] the invalidity of the punishment imposed is not cognizable under § 1983"); *Lanier v.

Bryant*, 332 F.3d 999, 1005-06 (6th Cir.2003)(applying *Heck v. Humphrey*, 512 U.S. 477 (1994)

to *Bivens* actions); *Johnston v. Sanders*, 86 F. App'x 909, 910 (6th Cir.2004)(prisoner could not

challenge a disciplinary proceeding resulting in a loss of good-time credits in a *Bivens* action

because his disciplinary conviction had not been reversed).

Accordingly, Parks' claim vis-à-vis to his DHO Hearing fails because challenges of

events related to his disciplinary conviction must be brought by way of a Petition for Writ of

Habeas Corpus under 28 U.S.C. § 2241.

Based on the foregoing, Parks has no valid basis to allege that the DHO decision

and sanctions imposed were in violation of his due process rights and/or the Constitution. There

has been no violation of the Plaintiff's due process rights, and there was sufficient evidence to

support the DHO's disciplinary sanctions. Moreover, a challenge to disciplinary convictions

must be brought by way of a Petition for Writ of Habeas Corpus, under 28 U.S.C. § 2241, not by

way of a *Bivens* civil rights action. Accordingly, Parks has failed to establish a sustainable

constitutional claim. Thus, the Complaint must be dismissed for failure to state a claim upon

which relief may be granted. Alternatively, the Defendants are entitled to summary judgment.

## IV.    QUALIFIED IMMUNITY

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that federal

officials are entitled to qualified immunity from suit for violations of constitutional rights insofar

as their conduct does not violate clearly established law. As long as there is a "legitimate

question" about the constitutionality of particular conduct, "it cannot be said that [such conduct] violates clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985). The scope of the right complained of "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S.635, 640 (1987). This standard ensures that government officials are on notice of the legality of their conduct before they are subjected to a lawsuit. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The Sixth Circuit has analyzed claims of qualified immunity in three (3) steps. *Cuco v. FMC Lexington*, 2006 WL 1635668, 38 (E.D.Ky. 2006), *aff'd*, 257 F. App'x. 897 (6th Cir. 2007), citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 545-46 (6th Cir. 2003); *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003).

First, the court determines whether the plaintiff has shown that his or her constitutional rights were violated. See *Davis v. Scherer*, 468 U.S. 183, 197 (1984) (When the defense of qualified immunity is raised, the plaintiff has the burden of establishing that the law was clearly established); *Sanderfer v. Nichols*, 62 F.3d 151, 153 (6th Cir. 1995). Second, if so, the court then determines whether that right was so "clearly established" at the time that a reasonable official would have known that his conduct violated that right. Third, the court must decide whether the evidence offered by the plaintiff is sufficient to demonstrate that the official's conduct was objectively unreasonable in light of the clearly established right. See *Cuco v. FMC Lexington*, *supra*, citing *Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005); *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court simplified the qualified immunity analysis, giving district courts the discretion to directly proceed to the question of whether the law was clearly established at the time of the alleged conduct such that a government

official would be on notice that the conduct was unconstitutional. *Id*. at 244. Under *Pearson*, district courts have discretion to bypass the question of whether the facts show a constitutional violation by the defendants. *Id*.

Under the qualified immunity standard established in *Pearson*, Parks has failed to: 1) meet his burden of establishing facts showing a violation of a constitutional right that was clearly established at the time of the alleged conduct; and 2) the evidence Parks offered is insufficient to demonstrate that the official's conduct was objectively unreasonable in light of the clearly established right. As stated previously herein, the Defendants' actions were not based on a retaliatory or harassing motive, but on sound correctional judgment. Further, there was no evidence that any Defendant used excessive force against Parks or engaged in a conspiracy against Parks.

In this case, the Defendants' conduct was reasonable given the circumstances of Parks' disruptive behavior and the need for disciplinary sanctions. The Defendants' disciplinary actions were penologically sound and necessary due to Parks' behavior. The Defendants were merely performing their duties in maintaining the safety and security of the correctional institution by sanctioning and deterring his disruptive behavior. At all times, the named Defendants were simply doing their jobs, unbeknownst to them that Parks would allege that their actions were in violation of the First, Fifth, Eighth, and Fourteenth Amendments.

Were this Court to question the actions of correctional staff every time an inmate has previously filed a grievance, correctional staff would never be able to undertake any perceived "adverse action" against an inmate for fear of being accused of violating the inmate's constitutional rights. As previously stated, an inmate cannot immunize himself from adverse

administrative action by merely filing grievances and then claiming that whatever happens next is retaliatory. *Antonelli*, 2009 WL 790171, at 7 (E.D.Ky. 2009).

Prison staff acting within the scope of their duties are shielded by qualified immunity when making decisions regarding the safety and security of the institutional facility. Staff should be able to make such decisions without fear of being sued for retaliation or harassment, use of excessive force, conspiracy, or other claims because an inmate had previously filed a grievance. Applying these standards, the Defendants are entitled to qualified immunity. See *Hunter v .Bryant*, 502 U.S. 224, 229 (1991)("[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"). Parks' Complaint must be dismissed. Alternatively, the Defendants are entitled to summary judgment.

## V. ALTERNATIVELY, THE FEDERAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56.

To grant a motion for summary judgment, a court must find there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A party seeking summary judgment bears the initial burden of specifying the basis upon which he contends judgment should be granted, and of identifying the portion of the record which, in his opinion, demonstrates the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the district court must make reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Summary judgment should be granted to the Defendants, pursuant to Fed. R. Civ. P. 56, which provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In ruling on a motion for summary judgment, the Supreme Court's decision in *Celotex Corp. v. Catrett*, *supra*, is instructive. The Court rejected a standard which required moving parties to support their motions for summary judgment with an affirmative evidentiary showing which tended to negate the essential elements of a plaintiff's case. *Celotex*, 477 U.S. at 324. Instead, the Court held that "[t]tle burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id*. Once the moving party has made this showing, the burden passes to the nonmoving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id*. at 324; see also, *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986).

To create a genuine issue of material fact, the nomnovant must do more than present some evidence on a disputed issue. As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986):

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Internal citations omitted). See also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* , 475 U.S. at 586-87. Thus, evidence presented by the nonmovant must be more than the nonmoving party's own pleadings and affidavits in order to survive summary judgment. See *Ashbrook v.*

*Block*, 917 F.2d 918, 921 (6th Cir.1990). In his initial pleadings, Parks failed to provide evidence that would support an allegation of retaliation or harassment, excessive use of force, conspiracy, or any other claims for having filed grievances. Additionally, Parks' response to the Defendants' motion to dismiss, or in the alternative, for summary judgment, provides no evidence to support his claims and is mostly a regurgitation of the claims made in the Complaint. As stated above, Parks' conclusory allegations of retaliatory motive and excessive force are unsupported by material fact on the record and are not sufficient to state a claim under *Bivens*. Moreover, the Defendants have provided a rational, penologically sound, and neutrally-motivated explanation for their actions.

In light of these standards, the Defendants have established that they are entitled to entry of summary judgment in their favor.

## VI

Accordingly, it is hereby **ORDERED** as follows:

(1)     Plaintiff James Darrell Parks' construed cross-motion for summary judgment [R. 70] is **DENIED**.

(2)     Defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b), or alternatively Motion for Summary Judgment [R. 52] is **GRANTED**.

(3)     Plaintiff James Darrell Parks' Complaint [R. 2] and Amended Complaint [R. 20] are **DISMISSED**.

(4)     The Court will enter an appropriate Judgment.

(5)     This matter is **STRICKEN** from the active docket.

This 29th Day of September, 2014.

 **Signed By:**

*__Gregory F. Van Tatenhove__*

**United States District Judge**